**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LAWRENCE ANTELOPE,
*Defendant-Appellant.*

No. 03-30334

D.C. No.
CR-00-00039-DWM

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LAWRENCE ANTELOPE,
*Defendant-Appellant.*

No. 03-30557

D.C. No.
CR-00-00039-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
June 8, 2004—Seattle, Washington

Filed January 27, 2005

Before: Melvin Brunetti, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

1151

**COUNSEL**

Anthony R. Gallagher, Federal Defender, John Rhodes, Assistant Federal Defender, and David Avery, Federal Defenders of Montana, Missoula, Montana, for the defendant-appellant.

William W. Mercer, United States Attorney, Marcia Hurd, Assistant United States Attorney, Billings, Montana, for the plaintiff-appellee.

**OPINION**

McKEOWN, Circuit Judge:

Lawrence Antelope is a convicted sex offender who shows promise of rehabilitation. The terms of his supervised release offer him treatment—but at a price he is not willing to pay. Antelope has repeatedly refused to incriminate himself as part of his sex offender treatment. He declines to detail his sexual

history in the absence of any assurance of immunity because of the risk that he may reveal past crimes and that his admissions could then be used to prosecute him. In response, the government has twice revoked his conditional liberty and sent him to prison. The case he now brings requires us to decide whether the government's actions violated his Fifth Amendment right against compelled self-incrimination. Because the Constitution does not countenance the sort of government coercion imposed on Antelope, and because his claim is ripe for adjudication, we reverse the judgment of the district court.

We decide also Antelope's challenge to the release term prohibiting him from possessing "any pornographic, sexually oriented or sexually stimulating materials," which we vacate and remand, as well as his challenge to the term prohibiting him from access to "any 'on-line computer service,' " which we affirm.

## BACKGROUND

The course of events leading to this appeal began when Lawrence Antelope joined an Internet site advertising "Preteen Nude Sex Pics" and started corresponding with someone who, unbeknownst to Antelope, was an undercover law enforcement agent. The sting operation proved fruitful when Antelope ordered a child pornography video over the Internet. Federal agents arranged a controlled delivery, delivered the video, and then promptly arrested Antelope.

Caught red-handed, Antelope pleaded guilty to possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and was initially sentenced to five years probation. One of the probation terms required Antelope to participate in the Sexual Abuse Behavior Evaluation and Recovery program ("SABER"), which would subject him to mandatory "periodic and random polygraph examinations." At sentencing, Antelope raised a Fifth Amendment challenge to this requirement, but was told by the district judge that the "use of that informa-

tion . . . is, I think, subject to the privilege between the counselor and the patient." Antelope was also prohibited from "possess[ing] any pornographic, sexually oriented or sexually stimulating materials" and from "possess[ing] or us[ing] a computer with access to any 'on-line computer service' at any location . . . without the prior written approval of the probation department." Both Antelope and the government promptly appealed the sentence.

While the appeal was pending, the district court revoked Antelope's probation for failure to comply with several probation conditions, including the requirement that he submit to polygraph examinations as part of the treatment program. The district judge re-imposed probation with an additional six months of electronic monitoring and warned that Antelope's continued refusal to submit to the polygraph would result in his incarceration. Antelope appealed this ruling as well.

Immediately following this ruling, Antelope filed a motion in the district court seeking to clarify whether the order included immunity from the use of Antelope's statements made in compliance with SABER to prosecute him. The district court never ruled on this motion, later dismissing it as moot.

While these appeals were pending, the district court again found Antelope in violation of probation. At the probation revocation hearing, Roger Dowty, Antelope's counselor at the sex treatment program, testified that Antelope had failed to complete SABER's sexual history autobiography assignment and "full disclosure polygraph" verifying his "full sexual history." Dowty explained that Antelope had been told that any past criminal offenses he revealed in the course of the program could be released to the authorities. Dowty also testified that he was under a legal obligation to turn over information regarding offenses involving victims under eighteen. Antelope argued that the autobiography and full disclosure polygraph requirements violated his Fifth Amendment right,

expressed his desire to continue treatment, and sought immunity for statements made in compliance with the program. The district court rejected his argument, ruling that the fact of probation nullifies any Fifth Amendment right Antelope might otherwise have to decline to "reveal[ ] information that may incriminate him," and sentenced him to 30 months in prison. Antelope appealed a third time.

All three appeals were consolidated for appellate review, and this court issued a decision reversing in part and remanding for resentencing. The court declined to reach Antelope's First and Fifth Amendment claims. *See United States v. Antelope*, 65 Fed. Appx. 112 (9th Cir. 2003) (mem.).

Following remand, Antelope was resentenced to twenty months incarceration, followed by three years of supervised release. The district court again imposed the contested conditions as terms of his supervised release. Antelope once again objected, but the court ruled that the objection was not ripe, and would not be ripe until Antelope was "prosecuted or subject to prosecution" for additional crimes. Antelope appealed once more. This fourth appeal is one of the two directly before us now.

Shortly after he was resentenced, Antelope finished serving his prison term and was released under supervision. Antelope reasserted his desire for treatment but continued to refuse to reveal his full sexual history absent an assurance of immunity. When Antelope appeared at a release revocation hearing, he yet again argued the merits of his Fifth Amendment claim. The district judge reiterated his belief that Antelope's admissions would be protected by an "absolute privilege under Montana law between a counselor, psychologist and the patient"; asserted that "given the fact that [Antelope has] not said anything yet, . . . everything is premature[ a]nd until this judicial proceeding, where he's compelled to testify, it seems to me, . . . you don't have any legal arguments to be making that are meritorious in my view today"; and declined to rule

on whether Antelope's admissions would be protected by use immunity, apparently on ripeness grounds. The district judge suggested that Antelope's proper course would be to "assert[ ] his privilege when he goes to see Mr. [Dowty, the counselor,] and say[ ], *I am doing this because I'm ordered to do it. I am not doing it voluntarily, it's a court order, and I do it only because if I don't do it I'm going to end up in jail.*"

The district court sentenced Antelope to an additional ten months in prison and twenty-six months of supervised release with the same conditions. Antelope appealed a final time, and we consider the issues presented by his consolidated fourth and fifth appeals.

## DISCUSSION

### I. RIPENESS

We turn first to the government's argument that Antelope's Fifth Amendment claim is not yet ripe for review. The constitutional component of ripeness is a jurisdictional prerequisite. *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093-94 & n.2 (9th Cir. 2003) (noting that the question of ripeness often "coincides squarely with standing's injury in fact prong"). Whether Antelope's claim is sufficiently mature to justify appellate review is a question of law we consider de novo. *Laub v. United States Dep't of the Interior*, 342 F.3d 1080, 1084 (9th Cir. 2003).

[1] To determine whether Antelope suffered an injury in fact, we must identify "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 1085. Here, Antelope's appeal centers around his claimed right to be free of unconstitutional compulsion: Under his theory, the government violated his Fifth Amendment right when it conditioned his probation and supervised release on the submission of a sexual autobiography that we may assume would

have revealed prosecutable offenses. From Antelope's per-spective, in whose shoes we stand when deciding this thresh-old issue of justiciability, he has already suffered the very serious and non-hypothetical injury of imprisonment after he invoked his Fifth Amendment right. In other words, "[i]f his legal argument is correct, he has already suffered constitu-tional injury." *United States v. Purvis*, 940 F.2d 1276, 1278 (9th Cir. 1991) (holding ripe the defendant's challenge to his supervised release condition, which he had been re-incarcerated for violating). Antelope's case history reads like a never-ending loop tape: he asserts his constitutional rights, the district court advises him that surely his statements will be confidential but that he must comply with what he views as a violation of his constitutional rights, he refuses to comply, his release is revoked, and Antelope ends up incarcerated. Indeed, it is difficult to imagine a more paradigmatic "injury in fact" than actual incarceration. We therefore conclude that Antelope's Fifth Amendment claim is ripe for review.

## II.  THE FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

Having determined the question justiciable, we address next Antelope's claim to the Fifth Amendment privilege against compelled self-incrimination, an issue that has domi-nated the five appeals Antelope has filed throughout the course of these proceedings. Antelope contends that the Fifth Amendment restrains the government from forcing him to admit prior wrongdoing unless his statements are protected by use and derivative use immunity in accordance with *Kastigar v. United States*, 406 U.S. 441 (1972). Whether there is merit to Antelope's argument is a legal matter, which we decide without deference to the judgment of the district court. *See United States v. Rubio-Topete*, 999 F.2d 1334, 1338 (9th Cir. 1993).

[2] We ground our analysis in well-settled principles, start-ing with the Constitution. The Fifth Amendment guarantees

that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This right remains available to Antelope despite his conviction. *See Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) ("A defendant does not lose this protection by reason of his conviction . . . ."); *cf. McKune v. Lile*, 536 U.S. 24, 48-54 (2002) (O'Connor, J., concurring in 4-1-4 decision) (applying the full-blown Fifth Amendment analysis to a prisoner's claim that the prison's requirement that he participate in a sex offender treatment program violated his constitutional right).[1]

**[3]** To establish his Fifth Amendment claim, Antelope must prove two things: (1) that the testimony desired by the government carried the risk of incrimination, *see Murphy*, 465 U.S. at 435 n.7 (explaining that the state may compel answers "as long as it . . . eliminates the threat of incrimination"); *Minor v. United States*, 396 U.S. 87, 98 (1969) (rejecting a Fifth Amendment challenge because the risk of incrimination was "only imaginary and insubstantial . . . rather than . . . real and appreciable" (internal quotation marks omitted)), and (2) that the penalty he suffered amounted to compulsion, *see Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) ("[T]he touchstone of the Fifth Amendment is compulsion . . . ." ); *cf. Lile v. McKune*, 224 F.3d 1175, 1179 (10th Cir. 2000) ("The privilege has two components: incrimination and compul-

---

[1]Abiding by the rule that when "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds," *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted), we treat Justice O'Connor's opinion in *McKune* as controlling. Two of our sister circuits considering this question have arrived at the same conclusion. *Ainsworth v. Stanley*, 317 F.3d 1, 4 (1st Cir. 2002) ("Justice O'Connor's concurrence [in *McKune*] is arguably more narrow than the plurality's and therefore constitutes the holding of the Court.") (internal quotation marks omitted); *Searcy v. Simmons*, 299 F.3d 1220, 1225 (10th Cir. 2002) ("Because Justice O'Connor based her conclusion on the narrower ground that the [Kansas] policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in *McKune*.").

sion."), *rev'd*, 536 U.S. 24 (2002) (holding the state-imposed repercussions insufficiently coercive to amount to compulsion).

## A.   Incrimination

The Fifth Amendment privilege is only properly invoked in the face of "a real and appreciable danger of self-incrimination." *McCoy v. Comm'r*, 696 F.2d 1234, 1236 (9th Cir. 1983) (internal quotation marks omitted). "If the threat is remote, unlikely, or speculative, the privilege does not apply . . . ." *Id.* Thus, the Constitution offers no protection to an individual who, for example, asserts a general intent to refuse to answer any questions at a court hearing. *See United States v. Pierce*, 561 F.2d 735, 741-42 (9th Cir. 1977) (holding that the probationer's Fifth Amendment claim could not be evaluated because he had tendered an unspecific "blanket refusal" to answer any questions at a district court hearing designed to probe his financial condition). Nor does its umbrella shelter statements whose ability to incriminate is "highly unlikely." *Seattle Times Co. v. United States Dist. Court*, 845 F.2d 1513, 1520 (9th Cir. 1988) (Reinhardt, J., concurring); *see also Minor*, 396 U.S. at 98 ("[I]maginary and insubstantial hazards of incrimination . . . [do not] support a Fifth Amendment claim." (internal quotation marks omitted)).

Instead, because the Fifth Amendment's self-incrimination clause was designed "to effect [the] practical and beneficent purpose" of preventing inquisitorial interrogation, *Brown v. Walker*, 161 U.S. 591, 596-97 (1896), it may only be invoked when the threat of future criminal prosecution is reasonably particular and apparent. *Cf. id.* at 598 ("[I]f a prosecution for a crime . . . is barred by the statute of limitations, [a witness] is compellable to answer."); *Neal v. Shimoda*, 131 F.3d 818, 833 (9th Cir. 1997) (holding that a prison treatment program requiring inmates to admit guilt of the crime for which they were imprisoned did not violate the Fifth Amendment because

double jeopardy and the terms of their plea agreement insured that "no admission . . . could be used against them").

This is not to say, however, that the prosecutorial sword must actually strike or be poised to strike. To the contrary, an individual "need not incriminate himself in order to invoke the privilege," *McCoy*, 696 F.2d at 1236, but may simply refuse to make any statements that place him at risk. *Accord Seattle Times*, 845 F.2d at 1520 (Reinhardt, J., concurring) ("[I]t is appropriate for a defendant to raise a fifth amendment objection at the time he is required to [make the potentially incriminating statements.]"). And as a general rule, countervailing government interests, such as criminal rehabilitation, do not trump this right. Thus, when "questions put to [a] probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution," he may properly invoke his right to remain silent. *Murphy*, 465 U.S. at 435.

**[4]** In this case, Antelope's risk of incrimination was "real and appreciable." The SABER program required Antelope to reveal his full sexual history, including all past sexual criminal offenses. Any attempt to withhold information about past offenses would be stymied by the required complete autobiography and "full disclosure" polygraph examination. Based on the nature of this requirement and Antelope's steadfast refusal to comply, it seems only fair to infer that his sexual autobiography would, in fact, reveal past sex crimes. Such an inference would be consistent with the belief of Roger Dowty, Antelope's SABER counselor, who suspects Antelope of having committed prior sex offenses. The treatment condition placed Antelope at a crossroads—comply and incriminate himself or invoke his right against self-incrimination and be sent to prison. We therefore conclude that Antelope's successful participation in SABER triggered a real danger of self-incrimination, not simply a remote or speculative threat.

We have no doubt that any admissions of past crimes would likely make their way into the hands of prosecutors. Dowty made clear that he would turn over evidence of past sex crimes to the authorities. As he explained at Antelope's probation revocation hearing, Dowty has reported his clients' crimes in the past and his reports have led to additional convictions. The SABER release form, which Antelope signed, specifically authorizes Dowty to make such reports.[2] And, were Antelope to reveal any crimes involving minors, Montana law would *require* Dowty to report to law enforcement. *See* Mont. Code Ann. §§ 41-3-201 to -202 (2003) (requiring counselors who suspect child abuse to report to the authorities).

In sum, the evidence shows that, setting the privilege aside, Antelope would have to reveal past sex crimes to the SABER counselor; the counselor would likely report the incidents to the authorities, who could then use Antelope's admissions to prosecute and convict him of the additional crimes. Viewed in this light, very little stands between Antelope's participation in SABER and future prosecution. When he invoked his Fifth Amendment right, Antelope's situation presented a "real and appreciable danger," not a "remote, unlikely, or speculative" risk. *See McCoy*, 696 F.2d at 1236. We conclude that Antelope has shown a sufficiently real possibility of incrimination.

## B.  Compulsion

The second prong of the self-incrimination inquiry asks whether the government has sought to "impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Cunningham*, 431 U.S. at 805. We are mindful that

---

[2]The SABER release form provides: "I hereby allow SABER to report to the appropriate authorities . . . any and all information concerning my behavior which is related to sexual offending."

an individual choosing silence does not get a free pass against all possible repercussions. *See, e.g.*, *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 286 (1998) (a state clemency board may draw "adverse inferences" from an inmate's failure to testify on his own behalf at a clemency hearing). Only "some penalties are so great as to 'compel' such testimony, while others do not rise to that level." *McKune*, 536 U.S. at 49 (O'Connor, J., concurring). The Supreme Court's decision in *McKune* requires us to conclude that this level has been breached in Antelope's case.

In *McKune*, a plurality of four justices concluded that the penalties faced by the inmate in that case, Robert Lile, for refusing to make disclosures required under Kansas's Sexual Abuse Treatment Program ("SATP") did not amount to compulsion under the Fifth Amendment. *Id.* at 29. Lile brought a § 1983 action against prison officials, alleging that they had violated his Fifth Amendment privilege against self-incrimination by reducing his privileges and transferring him from medium-security housing to maximum-security housing as a result of his refusal to disclose his sexual history as required by SATP.

The plurality rejected Lile's argument that his case was controlled by "the so-called penalty cases" like *Garrity v. New Jersey*, 385 U.S. 493, 497-98 (1967) (striking down state statute forcing public employees "either to forfeit their jobs or to incriminate themselves"), and *Spevack v. Klein*, 385 U.S. 511, 516 (1967) ("The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege."), where lesser penalties involving the potential loss of economic livelihood were held unconstitutional. The plurality distinguished those cases because they "involved free citizens" and were "not easily extended to the prison context." *McKune*, 536 U.S. at 40-41. Relying instead on prisoner-specific cases like *Murphy*, 465 U.S. at 434-39 (concluding that there was no Fifth Amendment violation

where petitioner claimed he felt compelled to incriminate himself because he feared absent truthful statements his probation would be revoked), and *Woodard*, 523 U.S. at 286-88 (concluding that there was no compulsion where a death row inmate had to choose between incriminating himself at a clemency interview and having adverse inferences drawn from his silence), where the Court found no Fifth Amendment violations despite the use of far harsher penalties such as longer incarceration or execution, the plurality wrote that "lawful conviction and incarceration necessarily place limitations on the exercise of a defendant's privilege against self-incrimination." *McKune*, 536 U.S. at 38.

In her concurrence, Justice O'Connor explained that penalties severe enough to offend the Fifth Amendment privilege include: "termination of employment, [*Uniformed Sanitation Men Ass'n, Inc. v. City of New York*, 392 U.S. 280 (1968)], the loss of a professional license, [*Spevack v. Klein*, 385 U.S. 511 (1967)], ineligibility to receive government contracts, [*Lefkowitz v. Turley*, 414 U.S. 70 (1973)], and the loss of the right to participate in political associations and to hold public office, [*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977)]." *McKune*, 536 U.S. at 49-50. In contrast, an inmate's "reduction in incentive level, and a corresponding transfer from a medium-security to a maximum-security part of the prison" were not "serious enough to compel him to be a witness against himself." *Id.* at 50.

**[5]** Significantly, Justice O'Connor did not attempt to establish the governing standard for all cases, noting that she did not "need [to] resolve this dilemma [of setting forth a comprehensive theory of the self-incrimination privilege] to make [her] judgment in" *McKune*. *Id.* at 54. Nevertheless, though Justice O'Connor's concurrence does not delineate the limits of the self-incrimination clause's protections, it makes clear that the Court likely would conclude that the penalty Antelope faced for not participating in SABER was constitutionally impermissible.

Although Justice O'Connor agreed with the plurality that Lile's "reduction in incentive level, and . . . corresponding transfer from a medium-security to a maximum-security part of the prison" were not penalties "sufficiently serious to compel his testimony," Justice O'Connor said that she "d[id] not agree with the suggestion in the plurality opinion that these penalties could permissibly rise to the level of . . . penalties [like] longer incarceration and execution [which] are far greater than those we have already held to constitute unconstitutional compulsion." *Id.* at 50, 52. Justice O'Connor did not accept the plurality's reasoning that the different outcomes in the "penalty cases" and the Court's decisions in cases like *Murphy* and *Woodard* could be explained on the basis of the citizen-prisoner distinction and that the key factor in assessing a prisoner's self-incrimination claim was whether the disputed penalty, in the plurality's language, amounted to an "atypical and significant hardship" within the prison context. Justice O'Connor explained:

> I believe the proper theory should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process. . . . Forcing defendants to accept such consequences seems to me very different from imposing penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony . . . .

*Id.* at 53 (internal citation omitted).

Thus, under Justice O'Connor's opinion in *McKune*, the compulsion inquiry does not dispositively turn on the status of the person claiming the Fifth Amendment privilege or on the severity of the penalty imposed, although these factors may bear on the analysis. Instead, the controlling issue is the state's purpose in imposing the penalty: Although it may be

acceptable for the state to impose harsh penalties on defendants when it has legitimate reasons for doing so consistent with their conviction for their crimes of incarceration, it is a different thing to impose "penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony." *Id.*

Applying these principles here, we reject that the state could sanction Antelope for his self-protective silence about conduct that might constitute *other* crimes. We do not doubt that SABER's policy of requiring convicted sex offenders to give a sexual history, admitting responsibility for past misconduct to participating counselors, serves an important rehabilitative purpose. *See, e.g., id.* at 33 (plurality opinion) ("An important component of [sex offender] rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct. . . . Research indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity.") (citing U.S. Dep't of Justice, Nat'l Inst. of Corr., A Practitioner's Guide to Treating the Incarcerated Male Sex Offender 73 (1988) and B. Maletzky & K. McGovern, Treating the Sexual Offender 253-55 (1991)). Often sex offenders repeat their past offenses, and informed counseling can only help protect them, their potential victims, and society. The irreconcilable constitutional problem, however, is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also may be starkly incriminating, and there is no disputing that the government may seek to use such disclosures for prosecutorial purposes. In fact, Antelope's SABER counselor testified that he routinely transmits to authorities any admissions his clients make about past sex crimes, and that such reports have led to more prosecutions and convictions. *Cf. McKune*, 536 U.S. at 40-41 (plurality opinion) (arguing that a "critical distinction" between *McKune* and the penalty cases where the Court found Fifth Amendment violations is that "[t]here is no indication that the SATP is an elaborate attempt to avoid the

protections offered by the privilege against compelled self-incrimination").

[6] Justice O'Connor made clear in her *McKune* concurrence that she would not have found a penalty of "longer incarceration" such as that here to be constitutionally permissible. *Id.* at 52. The strength of Justice O'Connor's opinion as precedent is reinforced because it seems certain that the four dissenters in *McKune,* who argued that a loss of discretionary privileges and a transfer to less desirable living quarters under similar circumstances were sufficiently compulsive to violate Lile's privilege against self-incrimination, would find a Fifth Amendment violation where the district court revoked Antelope's conditional liberty and sentenced him to an additional ten months in prison.[3] On the basis of *McKune*, we hold that Antelope's privilege against self-incrimination was violated because Antelope was sentenced to a longer prison term for refusing to comply with SABER's disclosure requirements.[4]

---

[3]Indeed, the *McKune* plurality, even with its more stringent standard, might here hold that the Fifth Amendment's self-incrimination clause was violated, given that the *McKune* plurality declared that Kansas had not used the information gathered in SATP for prosecutorial purposes, *id.* at 34, and that Lile's refusal to participate in Kansas's SATP did not result in an "exten[sion of] his term of incarceration." *Id.* at 38.

[4]The Court's pre-*McKune* decision in *Murphy* is consistent. In *Murphy* the defendant challenged a condition of his probation requiring him to "be truthful with [his] probation officer 'in all matters' " or "return to the sentencing court for a probation revocation hearing," arguing that this condition unconstitutionally forced him to choose between making self-incriminating disclosures or returning to prison. 465 U.S. at 422. The Court held that there was no Fifth Amendment violation because the defendant "could not reasonably have feared that the assertion of the privilege would have led to revocation," given that the state would have provided a hearing before revocation, and defendant could have raised the privilege as a reason for noncompliance, and that the defendant could point to no case in which Minnesota revoked probation when a probationer "refused to make nonimmunized disclosures concerning his own criminal conduct." *Id.* at 439. The Court said that the outcome would have differed if the state "expressly or by implication, assert[ed] that invocation

Our holding comports with the case authority in our sister circuits which suggests that the conditions must not only be sufficiently coercive, but also more than merely hypothetical. When probation and supervised release terms are at issue, a court must determine whether the alleged Fifth Amendment problem truly implicates the defendant's conditional liberty. In *United States v. Lee*, 315 F.3d 206, 212 (3d Cir. 2003), *cert. denied*, 540 U.S. 858 (2003), for example, the Third Circuit rejected a defendant's challenge to his supervised released condition because Lee offered "no evidence that [his] ability to remain on probation is conditional on his waiving the Fifth Amendment privilege with respect to future criminal prosecution." In *Lee*, the prosecutor had stipulated that Lee's failure "to pass a polygraph examination, in and of itself, likely would not result in a finding of a supervised release violation." *Id.* Without the real risk of revocation, the polygraph's effect on Lee could not amount to constitutional compulsion.

The First Circuit likewise faced a Fifth Amendment challenge to a supervised release condition imposing a polygraph exam requirement in *United States v. York*, 357 F.3d 14 (1st Cir. 2004). The twist in *York* was an ambiguous provision in the release condition: "When submitting to a polygraph exam, the defendant does not give up his Fifth Amendment rights." *Id.* at 18. The First Circuit grappled with York's Fifth Amendment challenge, acknowledging that "the polygraph requirement may implicate York's Fifth Amendment rights, depending on how the district court's order is understood." *Id.* at 24. The *York* court carefully avoided interpreting the release condition to mean "that it flatly requires York to sub-

---

of the privilege would lead to revocation of probation," because this would have resulted in "the classic penalty situation." *Id.* at 435. Here we have the "classic penalty situation" contemplated in *Murphy*; Antelope's supervised release ended because he would not make potentially self-incriminating statements as required by SABER.

mit to polygraph testing as a condition of his supervised release, so that York's refusal to answer any question—even on valid Fifth Amendment grounds—could constitute a basis for revocation." *Id.* Rather than impute this "constitutionally problematic" meaning to the release condition, the First Circuit simply construed it to mean that "York's supervised release shall not be revoked based on his valid assertion of Fifth Amendment privilege during a polygraph examination." *Id.* at 24-25.

Although the First and Third Circuits found an interpretative way around the Fifth Amendment issue, the path of constitutional avoidance taken in *York* and *Lee* is unavailable here. Whether Antelope's supervised release is actually conditioned on his participation in SABER is a question whose answer is certain. Antelope has already suffered repeated revocation of his conditional liberty as a result of invoking his Fifth Amendment right. And, we have no doubt that Antelope's loss of liberty was as "substantial" a penalty as, if not more serious than, the ones imposed upon the litigants in the line of cases from *Spevack* to *Cunningham*—and totally unlike the mere transfer from one part of a prison to another, as in *McKune*.

**[7]** Here, the district court tried to walk a fine line between the government's absolutist view—that full disclosure without immunity was a condition of release—and Antelope's view—that full disclosure without Fifth Amendment protection was a no-win proposition. Although this effort was laudable and the district court was sensitive in recognizing Antelope's Catch-22 predicament, its ruling left Antelope in legal limbo. Ultimately, the district court revoked Antelope's supervised release as a result of his refusal to disclose his sexual history without receiving immunity from prosecution. Because the government and district court have consistently refused to "recognize[ ] that the required answers may not be used in a criminal proceeding" against Antelope, *Murphy*, 465 U.S. at 435 n.7, we hold that the revocation of his probation and

supervised release violated his Fifth Amendment right against self-incrimination.

## C.   Antelope's Entitlement to *Kastigar* Immunity

The nature of Antelope's entitlement to immunity for incriminating statements is subject to some dispute between the parties. We find it appropriate to resolve their disagreement because the issue is intimately bound up with the resolution of the merits of Antelope's Fifth Amendment claim. The government argues that Antelope has no entitlement to an assurance of immunity before he makes incriminating statements. *See Kastigar*, 406 U.S. at 453 (holding use and derivative use immunity under 18 U.S.C. §§ 6002-6003 co-extensive with the Fifth Amendment privilege). It contends, in effect, that the government has the right to compel Antelope to incriminate himself, prosecute him, and force him to litigate the admissibility of each piece of evidence in future criminal proceedings. Only then, according to its view, can Antelope properly assert his Fifth Amendment privilege. We disagree.

As the Supreme Court has explained, adoption of the government's position would all but eviscerate the protections the self-incrimination clause was designed to provide. *See, e.g.*, *Turley*, 414 U.S. at 78 ("[A] witness protected by the privilege may rightfully refuse to answer *unless and until* he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." (emphasis added)). More recently, Justice Thomas, speaking for four members of the Court, reaffirmed this principle: "By allowing a witness to insist on an immunity agreement *before* being compelled to give incriminating testimony in a noncriminal case, the privilege preserves the core Fifth Amendment right from invasion . . . ." *Chavez v. Martinez*, 538 U.S. 760, 771 (2003) (Thomas, J., in a plurality opinion joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.) (emphasis in original).

That this protection should be the law is only logical; "the failure to assert the privilege will often forfeit the right to exclude the evidence in a subsequent 'criminal case.' " *Id.* (citing *Murphy*, 465 U.S. at 440). Without a pre-testimonial assurance of immunity, the witness would scarcely be better protected than if there were no privilege at all. *See id.* ("If the privilege could not be asserted [before making the incriminating disclosure], testimony given in those judicial proceedings would be deemed 'voluntary' . . . ." ). Our conclusion in this case gives effect to Justice Thomas's admonition that "it is necessary to allow assertion of the privilege prior to the commencement of a 'criminal case' to safeguard the core Fifth Amendment trial right." *Id.*

In the face of the vast weight of precedent to the contrary, *see, e.g.*, *Murphy*, 465 U.S. at 429-40 (discussing circumstances where the Fifth Amendment privilege is triggered the moment a defendant is compelled to give statements which might incriminate him in criminal proceedings, even if such proceedings have yet to be initiated), the government contends that *Chavez* stands for the proposition that Antelope may not assert the Fifth Amendment right until the moment a compelled statement is used in a criminal proceeding against him. But *Chavez* did not, as the government suggests, unseat decades of Supreme Court law. Instead, the government's argument reveals a fundamental misunderstanding of *Chavez*.

*Chavez* was a civil rights suit filed under 42 U.S.C. § 1983 by a plaintiff alleging that a police officer who aggressively questioned him violated his Fifth Amendment right. Six justices agreed with the defendant police officer that the cause of action premised on a Fifth Amendment violation could not survive summary judgment. *See Chavez*, 538 U.S. at 766-67 (Thomas, J., joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.); *id.* at 777-79 (Souter, J., concurring, joined by Breyer, J.). But *Chavez* left unaltered the Court's commitment to safeguarding the Fifth Amendment's core guarantee under

the circumstances presented here—a point the government chooses to ignore. Critical to the reasoning of all six justices was the simple principle that the scope of the Fifth Amendment's efficacy is narrower when used as a sword in a civil suit than when used as a shield against criminal prosecution. *See id.* at 772-73 (Thomas, J., joined by Rehnquist, C.J., O'Connor, J., and Scalia, J.) ("Rules designed to safeguard a constitutional right [such as that protected by the self-incrimination clause] do not extend the scope of the constitutional right itself . . . . Accordingly, Chavez's failure to read *Miranda* warnings to Martinez . . . cannot be grounds for a § 1983 action. And the absence of a 'criminal case' in which Martinez was compelled to be a 'witness' against himself defeats his core Fifth Amendment claim." (internal citations omitted)); *id.* at 777-78 (Souter, J., concurring, joined by Breyer, J.) (explaining that while case law "requiring a grant of immunity in advance of any testimonial proffer . . . . is outside the Fifth Amendment's core," the privilege's protections will only be expanded where "the core guarantee, or the judicial capacity to protect it, would be placed at some risk in the absence of such complementary protection," and concluding that it was not "necessary to expand protection of the privilege . . . to . . . civil liability"). Simply stated, the holding of *Chavez* is tightly bound to its § 1983 context.

**[8]** Were Antelope to turn the tables and sue the government, *Chavez* would direct our inquiry to the "core constitutional right"—and, in such a posture, the government's argument might well prevail. But here, where Antelope is on the defensive, Fifth Amendment case law offers him protection beyond what the *Chavez* plurality called the "core" right. Thus, whether we describe our decision as arising out of a "prophylactic" or "constitutional" rule, the same result obtains: Antelope followed the appropriate course of action by refusing to answer the sexual history question until he was assured that his answers would be protected by immunity.[5]

---

[5]The scope of the immunity should be consistent with the Supreme Court's opinion in *Kastigar*, 406 U.S. at 453 (holding that "immunity

### III.   THE PROHIBITION ON "ANY PORNOGRAPHIC MATERIALS"

**[9]** Antelope also challenges as unconstitutionally vague the provision of his supervised release prohibiting him from possessing "any pornographic, sexually oriented or sexually stimulating materials." In *United States v. Guagliardo*, 278 F.3d 868 (9th Cir. 2002), we held impermissibly vague a similar supervised release term. Guagliardo was prohibited from possessing " 'any pornography,' including legal adult pornography." *Id.* at 872. Because "a probationer cannot reasonably understand what is encompassed by a blanket prohibition on 'pornography,' " we remanded for clarification. *Id.* We do the same here. The condition imposed on Antelope is indistinguishable from the one imposed on Guagliardo. Here, instead of "any pornography," we have "any pornographic . . . materials."

The government contends that "sexually oriented or sexually stimulating" should be read to define "pornographic." We decline to adopt this grammatically unnatural reading. The release term explicitly lists three types of materials that Antelope may not possess: "any pornographic, sexually oriented or sexually stimulating materials." Because the condition imposed on Antelope suffers from the same defect as the one struck down in *Guagliardo*, we vacate and remand for clarification. Upon reconsideration, the district court may take note of the condition imposed in *United States v. Rearden*, 349 F.3d 608 (9th Cir. 2003), which passed constitutional muster.

### IV.   THE PROHIBITION ON "ACCESS TO ANY ON-LINE COMPUTER SERVICE"

Antelope's final argument challenges as overbroad the supervised release term prohibiting him from "possess[ing] or

---

from use and derivative use [provided by 18 U.S.C. §§ 6002-6003] is coextensive with the scope of the privilege against self-incrimination"). *Kastigar*, of course, does not insulate Antelope from prosecution altogether, just from the "use and derivative use" of compelled admissions in trial against him. *Id.*

us[ing] a computer with access to any 'on-line computer ser-vice' at any location (including employment) without the prior written approval of the probation department."

**[10]** As Antelope acknowledges, we recently rejected pre-cisely such a challenge in *Rearden*. *See id.* at 620-21. He argues, however, that his case should be treated differently because his crime involved less use of the Internet and was less severe than Rearden's. Although there is some appeal to this nuance, the Internet was nevertheless essential to the commission of Antelope's crime: He first contacted the fed-eral agents through joining a child pornography-oriented online group. Added to the evidence suggesting that Ante-lope's crime was one step on a path towards more serious transgressions, there is enough to justify the imposition of the term "to protect the public from further crimes of the defen-dant" and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553 (a)(2)(B) & (C). We affirm the imposition of this provision of Antelope's supervised release.

## CONCLUSION

Accordingly, the decision of the district court revoking Antelope's supervised release because he invoked his Fifth Amendment rights in connection with the SABER program is **REVERSED**, the imposition of the release term prohibiting access to "any pornographic materials" is **VACATED** and **REMANDED**, and the release term prohibiting "access to any 'on-line computer service' " is **AFFIRMED**.