In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3256

DONALD LACY, on behalf of himself and all
others similarly situated,

*Petitioner-Appellee,*

*v.*

KEITH BUTTS, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 13-CV-00811 — **Richard L. Young**, *Judge.*

ARGUED OCTOBER 26, 2018 — DECIDED APRIL 25, 2019

Before WOOD, *Chief Judge*, and SYKES and SCUDDER, *Circuit
Judges*.

WOOD, *Chief Judge*. When the state wants to encourage sus-
pects, defendants, or incarcerated offenders to admit guilt, it
has many tools at its disposal. Before or during trial, prosecu-
tors may hold out the prospect of a plea bargain. Judges may
reward defendants with a sentence reduction for accepting re-
sponsibility. Prison rehabilitation programs may offer

benefits and incentives by conditioning visitation rights, work opportunities, housing in a lower-security unit, and other privileges on an offender's willingness to admit responsibility for the crime of conviction. *McKune v. Lile*, 536 U.S. 24, 40 (2002).

But the Fifth Amendment draws one sharp line in the sand: no person "shall be *compelled* in any criminal case to be a witness against himself." U.S. CONST. amend. V. (emphasis added). This case requires us to decide whether Indiana's Sex Offender Management and Monitoring (INSOMM) program crosses that line with its system of revoking good time credits and denying the opportunity to earn such credits for convicted sex offenders who refuse to confess their crimes. In an action brought by a class led by Donald Lacy, an inmate subject to INSOMM, the district court ruled that Indiana's system as currently operated impermissibly compels self-incrimination and must be revised. We affirm.

**I**

Indiana requires all inmates convicted of a sex offense to complete the INSOMM program before release. The program is divided into three phases. During Phase 1, which focuses on "Consent and Assessment," participants must fill out a Sex Offender Questionnaire that asks them to identify which illegal sexual acts (for instance, rape, child molestation, or prostitution) they committed and how often. Based on their offense history, participants are then sorted into one of three risk groups for Phase 2, "Risk Based Sex Offender Treatment," which consists of group therapy sessions led by counselors. Inmates meet only with others assessed at the same risk level; this becomes their "core group." The higher-risk groups must complete more hours of therapy. In preparation for the

therapy sessions, participants must fill out workbooks that require them to describe in detail *all* past acts of sexual violence and abuse, regardless of whether they were ever charged for those offenses. Finally, after release participants must complete Phase 3, "Community Management and Monitoring," which is not at issue in this case.

As INSOMM stresses to its participants throughout the program, they enjoy neither immunity nor confidentiality for any of the disclosures they make at any stage. Moreover, participation is an all-or-nothing affair: inmates may not opt out of any part of the program, and they are required to respond fully to all questions asked. A counselor who suspects that a participant has been either deceptive or less than forthcoming has the discretion to order polygraph testing. Such an order triggers a requirement for the participant to fill out a detailed Polygraph Sex History Questionnaire. A participant is excused from admitting responsibility for an offense only if the polygraph examination indicates no deception *and* the counselors agree that the participant is being truthful.

Failure to participate satisfactorily in INSOMM is costly. It is treated as a Class A or Major Conduct disciplinary violation. That is the same class assigned to rioting, escape, rape, or assault on prison staff. The particular Class A violation at issue in our case—Code 116, "Refusing a Mandatory Program"—applies to a much broader range of conduct than a flat-out refusal to participate. Inmates who refuse a polygraph examination, deny parts of their offenses, give answers that are deemed to be incomplete or dishonest, or otherwise fail to "adhere to treatment expectations" also qualify for a Code 116 violation. The INSOMM counselors make the final decision whether an inmate's conduct merits disciplinary action.

For a first Code 116 offense, inmates are penalized (among other ways) by placement in a credit class that denies them the opportunity to accrue good-time credits. These are credits to which they would otherwise be entitled by statute. IND. CODE § 35-50-6-3 (accrual of credit time for people convicted up to June 30, 2014); § 35-50-6-3.1 (same, for people convicted after June 30, 2014); § 35-50-6-5 (deprivation of credit time). If an inmate persists in whatever conduct gave rise to the disciplinary action—such as by refusing to admit a particular crime or answer a particular question—he is regarded as committing a continuing Code 116 violation punishable by revocation of 180 days of already-acquired good-time credits for every 60 days during which the noncompliance continues. While the violation is ongoing, the inmate is barred from earning new good time credits. Some class members have lost all of their accrued good-time credits as a result of this system.

Lacy brought this case on May 16, 2013, under 28 U.S.C. § 2254, on behalf of a class of Indiana inmates who have been punished with a loss of good-time credits and a demotion in credit class for failure to abide by the requirements of IN-SOMM. On September 20, 2015, the district court certified the class. (For ease of exposition, we refer to Lacy's arguments, on the understanding that he presents them on behalf of the entire class.) Lacy argues that the disclosures required by IN-SOMM and the penalties imposed for non-participation, taken together, amount to a violation of his Fifth Amendment right to be free from compelled self-incrimination. The district court agreed and ordered the issuance of the writ of habeas corpus to restore the class's lost good-time credits. It also vacated all disciplinary actions and sanctions for failure to participate in INSOMM.

On appeal, Indiana argues both that the INSOMM program does not carry a sufficiently serious risk of incrimination to trigger the protections of the Fifth Amendment, and that even if it does, the revocation of credit time and the demotion in credit class do not add up to unconstitutional compulsion. Because the district court resolved the case on summary judgment, we consider its decision *de novo. Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015).

## II

To succeed in his Fifth Amendment challenge to INSOMM, Lacy must demonstrate that the disclosures to which he objects are (1) testimonial, (2) incriminating, and (3) compelled. *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004). Because the parties do not dispute that the disclosures are testimonial, we need decide only the latter two issues: whether the program calls for incriminating information; and if so, whether participation is "compelled" as that term is used in the Supreme Court's Fifth Amendment jurisprudence.

### A

Lacy's first task is to show the risk of self-incrimination that flows from an inmate's participation in INSOMM is "real and appreciable," rather than "imaginary and insubstantial." *Marchetti v. United States*, 390 U.S. 39, 48 (1968). He can do so even if the required disclosures would not "in themselves support a conviction," so long as they would "furnish a link in the chain of evidence" that could lead to a criminal prosecution. *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

A closer look at INSOMM shows that Lacy has met that burden. The extensive information that INSOMM requires of

its participants—with the express warning that neither im-munity nor confidentiality will be available—exposes Lacy and his fellow class members to the risk of future criminal in-vestigation and prosecution. Although Indiana contends that "the INSOMM program permits participants to describe their actions in the most general terms," a few examples illustrate why this benign description is not supported by the record.

First, in the disclosure assignments that make up part of the core-group workbooks, the program directs the partici-pant to be "detailed and specific" about each victim he has harmed, using a separate sheet for each one. In the Medium Risk Core Group Workbook, the questions that the partici-pant must answer for each past act of sexual violence or abuse include the participant's age and the victim's age at the time of the offense; the first name of the victim; the participant's relationship to the victim; "what parts of [the participant's] body" touched "what parts of [the victim's] body"; "how many times [the participant] offended the victim and over what period of time"; "where and when" the abuse occurred; how the victim was selected and groomed; and the types of force used to ensure the victim's compliance. The High Risk Core Group Workbook includes these questions and more: it also asks the participant to describe "in detail the set-up of the sexual abuse of each victim"; patterns among his victims, such as their age, appearance, and race; "when and how" the abuse started with each victim; and "in what ways [the partici-pant's] … sexual offending behavior change[d] over time."

If counselors find any of the responses to those questions to be inaccurate or incomplete—a determination they have unfettered discretion to make—they can refer the participant for a polygraph examination. Such a referral starts with the

obligation to fill out yet another, equally intrusive, question-naire. The polygraph questionnaire asks highly specific questions, such as: "How many children have you physically forced into sexual activities? Describe what you did."; "How many times have you had sexual contact with someone who is handicapped? Describe."; and "How many times have you made child pornography (taken pictures, video-tapes, films, etc.) of nude children or children engaged in sex acts? Describe." The participant must also "write the number of times" that he has masturbated in each of 31 different public places, indicate the most recent time he exposed himself to someone, and describe times when he had sexual contact with someone who was drunk or under the influence of drugs. For each victim, the participant must indicate whether he engaged in any one of 27 specific actions and how many times, including whether he "put [his] penis inside [the victim's] vagina (even a little bit)," "threatened [the] victim with harm," or "masturbated in front of [the] victim."

Truthful and complete answers to questions such as these—and there are many, many more—are highly pertinent to crimes beyond those of conviction. The odds that some participants would be investigated and successfully prosecuted for past uncharged crimes are high. The required disclosures could provide enough detail to kickstart a brand-new investigation. (By the time the state knows the victim's first name, age, and relationship to the offender, as well as when and where the abuse took place, it often will require little outside investigation to complete the story.) INSOMM disclosures might advance or substantiate an ongoing investigation or one that was halted for lack of evidence. In current or potential prosecutions, disclosures from INSOMM could confirm identity or *modus operandi*. FED. R. EVID. 404(b)(2). And when

the questions require an admission of responsibility for the crime of conviction rather than for an uncharged crime, a participant who pleaded not guilty and testified in his own defense could be exposed to perjury charges. In short, when Indiana requires inmates to describe all of their past sexual offenses in minute detail, the risks of self-incrimination are far from "remote" or "speculative." *Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972). They are self-evident.

Indiana's arguments to the contrary are unpersuasive. It places great weight on the fact that "[p]articipants are not required to identify their victims or specific dates of the sexual activity" and that they "are specifically advised not to provide identifying information." But that general statement collides with the specific command to provide highly detailed questions about each incident of past sexual abuse, omitting only the date and the victim's last name (or even full name). The required details easily raise a significant risk of incrimination. The state has not explained how it is possible to answer these more specific questions—such as the age of the victim and the victim's relationship to the participant—while taking advantage of the general admonishment to avoid "identifying information." Ignoring the actual questions, the state insists that the disclosures are at such a high level of generality that they "could not support a link in the chain sufficient to support an investigation or even admission at trial."

Saying so does not make it so. This *ipse dixit* does not explain why granular descriptions of the circumstances surrounding specific sex crimes and patterns of criminal sexual behavior would prove useless to investigators or prosecutors. The Fifth Amendment "protects against any disclosures which the witness reasonably believes *could be used* in a

criminal prosecution or *could lead to other evidence* that might be so used." *Kastigar v. United States,* 406 U.S. 441, 445 (1972) (emphasis added). The questions posed to an INSOMM participant would yield answers that any competent sex-crimes investigator or prosecutor would love to have.

Indiana also stresses that "no prosecutions have been initiated as a result of the INSOMM program." But this fact—assuming it is true—is not determinative. It is not the case that "a witness' constitutional privilege against self-incrimination depends upon a judge's prediction of the *likelihood* of prosecution. Rather … it is only where there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well taken." *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir. 1979) (emphasis added).

Indeed, in its reply brief the state all but concedes that the necessary level of risk is present. It admits there that the possibility of prosecution is anything but "fanciful." It does so in the course of explaining why INSOMM does not provide immunity for its participants. Offenders, the state insists, must feel the risk of prosecution for the program to achieve its therapeutic goals. "Immunity is not an option. If prisoners know they will never be prosecuted for past offenses, they may be led to believe that society does not consider their crimes to be serious." No one says that the state is obliged to grant immunity, of course; *Lile* holds otherwise. 536 U.S. at 27. But the state's recognition that the disclosures run enough risk of self-incrimination that a prisoner might *want* immunity is telling. It seems to us that the state is trying to have it both ways: on the one hand, it wants us to believe that the rehabilitative purpose of INSOMM depends on the disclosures' carrying a meaningful risk of prosecution; but on the other hand, it

maintains that this risk is too remote to implicate the Fifth Amendment. Our own independent assessment of the program convinces us that the disclosures do give rise to a real and appreciable risk of prosecution.

B

That brings us to the central question on appeal: whether INSOMM, through its denial of the opportunity to earn good-time credits and its revocation of credits already earned, as a means of inducing participants to furnish information, *compels* self-incrimination in contravention of the Fifth Amendment.

We acknowledge that the line between permissible pressure and impermissible compulsion can be difficult to draw. That may explain why in *Lile*, the Supreme Court's latest pronouncement on the subject, the justices failed to produce a majority opinion. 536 U.S. 24. Nonetheless, many cases are not close to the line, and ours is one of them. All five justices joining the judgment in *Lile* singled out the extension of a term of incarceration as a penalty more severe than the one before them. We look for guidance to Justice O'Connor's plurality opinion, which we find reflects the narrowest grounds accepted by the concurring justices and thus is controlling under the rule of *Marks v. United States*, 430 U.S. 188, 193 (1977). Justice O'Connor summarized the relevant restrictions imposed on inmate Lile as follows:

> These consequences involve a reduction in incentive level, and a corresponding transfer from a medium-security to a maximum-security part of the prison. In practical terms, these changes involve restrictions on the personal property respondent can

> keep in his cell, a reduction in his visitation privileges,
> a reduction in the amount of money he can spend in
> the canteen, and a reduction in the wage he can earn
> through prison employment.

536 U.S. at 50–51.

Justice O'Connor's concurrence specifically identified a longer term of incarceration as an impermissible penalty, at least if it were imposed automatically. 536 U.S. at 52 ("The penalties potentially faced in these cases—longer incarceration and execution—are far greater than those we have already held to constitute unconstitutional compulsion in the penalty cases. Indeed, the imposition of such outcomes as a penalty for refusing to incriminate oneself would surely implicate a 'liberty interest.'"). Her rationale leads to the conclusion that Lacy faced unconstitutional compulsion. *Cf. United States v. Antelope*, 395 F.3d 1133, 1138 (9th Cir. 2005) ("Justice O'Connor made clear in her *McKune [v. Lile]* concurrence that she would not have found a penalty of 'longer incarceration' such as that here to be permissible."). See also *Glover v. United States*, 531 U.S. 198 (2001) (error leading to longer sentence is prejudicial for Sixth Amendment purposes, even if the extension is not a long one).

The plurality opinion in *Lile* is not to the contrary. The four justices in the plurality went out of their way to distinguish the penalties they found permissible from the sort of punishment at issue in this case. They noted that Lile's "decision not to participate … did not *extend* his term of incarceration. Nor did his decision affect his eligibility for good-time credits or parole." *Lile*, 536 U.S. at 38 (plurality opinion; emphasis added). Like Justice O'Connor, the plurality suggested that when the penalty in question was as serious as a longer term

of incarceration, the *automatic* imposition of such a penalty would amount to unconstitutional compulsion. "States may award good-time credits and early parole for inmates who accept responsibility because silence in these circumstances does not automatically mean the parole board, which considers other factors as well, will deny them parole." *Id.,* citing *Baxter v. Palmigiano*, 425 U.S. 308, 317–18 (1976). For this purpose, the distinction between a discretionary award of less time and the automatic deprivation of an earned sentence reduction is critical.

Three of our sister circuits share this understanding of *Lile*. See *Antelope*, 395 F.3d at 1133 n.1; *Ainsworth v. Stanley*, 317 F.3d 1, 4 (1st Cir. 2002); *Searcy v. Simmons*, 299 F.3d 1220, 1225 (10th Cir. 2002); see also *United States v. Von Behren*, 822 F.3d 1139, 1147–48 (10th Cir. 2016). (There are also two unpublished decisions that discuss *Lile* more briefly; they do not reach any contrary conclusions about the effect of the O'Connor opinion. See *Edwards v. Goord*, 362 F. App'x 195 (2d Cir. 2010); *Thorpe v. Grillo*, 80 F. App'x 215 (3d Cir. 2003).)

More broadly, the Supreme Court has emphasized that punishments implicating the length of confinement are different in kind from those that affect the conditions of confinement. Here, Indiana considers no other factors as it evaluates whether to revoke an inmate's good time credits or to deny him the opportunity to earn such credits. The decision to decline participation in INSOMM is not merely a trigger for a later stage in which the state takes a more holistic view of an inmate's progress toward rehabilitation. Instead, a prisoner's choice to invoke his privilege against self-incrimination is the direct cause of his loss of credits—credits that otherwise would be statutorily guaranteed (assuming no independent

reason to revoke them). IND. CODE §§ 35-50-6-3, 35-50–6-5. Neither the plurality nor the concurring opinions in *Lile* support such a system. Nor, for that matter, did the dissenters. As the Ninth Circuit noted in *Antelope*, 395 F.3d at 1138, the dissenters found even the existing penalties to be unconstitutionally coercive; the more severe sanction of longer incarceration would have been at least as problematic.

Indiana stresses that its credit-time statute explicitly contemplates the revocation of credit time for an offender who "refuses to participate in a sex offender treatment program" during incarceration. IND. CODE § 35-50-6-5(a)(6). But that does not answer the question before us, which is whether it is permissible to strip a prisoner of a constitutional right as a means of forcing participation. We have no quarrel with the proposition that the state may use other penalties or inducements.

Indeed, we can assume that there is still some room for parole revocation, depending on the circumstances. But that measure must be used with care. Other courts of appeals that have evaluated these programs since *Lile* have found that revocation of parole as a penalty for non-participation is permissible in situations where it does not automatically follow. See *Ainsworth*, 317 F.3d at 4–5 (noting that the denial of parole "was not entirely automatic"); *Thorpe*, 80 F. App'x 215 (finding no unconstitutional compulsion where an inmate's refusal to participate in a treatment program did not "automatically deprive him of consideration for parole"). In contrast, the Ninth Circuit held that a district court's decision explicitly to condition a prisoner's supervised release on his successful completion of a treatment program similar to INSOMM violated the inmate's right to be free from compelled self-incrimination.

*Antelope*, 395 F.3d at 1139. Just as in *Antelope*, Lacy's refusal to incriminate himself has rendered him categorically ineligible for the shorter term of confinement he otherwise would have received. The Fifth Amendment does not allow Indiana to impose such a penalty.

Finally, we stress that this case relates to the length of time Lacy will be incarcerated, not to the conditions of his confinement. It thus falls on the habeas-corpus side of the line drawn by *Preiser v. Rodriguez*, 411 U.S. 475 (1973), not the section 1983 side. In fact, Lacy originally brought his suit as a section 1983 action, but we held that a petition under section 2254 was the only appropriate vehicle for his claim. *Lacy v. Indiana*, 564 F. App'x 844 (7th Cir. 2014) (unpublished order). His case is thus distinguishable from *Lile*, insofar as the sanctions that the Supreme Court endorsed in *Lile* were all conditions of confinement, not measures that would affect duration.

### III

We AFFIRM the judgment of the district court.