The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

2016 CO 36

Supreme Court Case No. 13SA268

Original Proceeding Pursuant to C.A.R. 21

Douglas County District Court Case No. 08CR109

Honorable Richard B. Caschette, Judge

In Re

 Plaintiff:

The People of the State of Colorado,

v.
 Defendant:

Bryan Roberson.

Rule Made Absolute

en banc

May 16, 2016

Attorneys for Plaintiff:

George H. Brauchler, District Attorney, Eighteenth Judicial District Richard Orman, Senior Deputy District Attorney

Centennial, Colorado

Attorneys for Defendant:

Douglas K. Wilson, Public Defender Lynn Noesner, Deputy Public Defender Denver, Colorado
 
JUSTICE GABRIEL delivered the Opinion of the Court. JUSTICE COATS dissents, and JUSTICE EID joins in the dissent.
¶1       In this original proceeding, the People challenge the district court’s order denying the probation department’s complaint to revoke Bryan Roberson’s sex offender intensive supervision probation
("SOISP"). As pertinent here, the People sought to revoke Roberson’s probation because he, among other things, allegedly failed to participate actively in a sex offender evaluation and treatment program. The alleged failure was based on Roberson’s
post-trial refusal to answer a polygraph examiner’s questions regarding Roberson’s use or viewing of child pornography while on probation and sexual fantasies that he had had involving minors. Roberson refused to answer these questions
based on the advice of counsel and on his fear that his answers could be used against him in future criminal proceedings, given that the direct appeal of his conviction remained pending at that time.
¶2       The district court denied the People’s revocation complaint, concluding that "to require Roberson to answer sexual oriented [sic] questions, under the circumstances, violates his Fifth Amendment rights,
and his probation cannot be revoked on those grounds."
¶3       We agree with the district court that on the facts presented here, Roberson’s privilege against self-incrimination precluded the court from revoking Roberson’s probation based on his refusal to answer
the polygraph examiner’s question regarding his use or viewing of child pornography while he was on probation. On the record before us, however, we are unable to determine whether the court correctly found that Roberson’s privilege against
self-incrimination precluded the court from revoking Roberson’s probation based on his refusal to answer questions concerning any sexual fantasies involving minors that he might have had within the preceding six months.
¶4       Accordingly, we make absolute the order to show cause and remand this case to the district court with directions that the court conduct further proceedings as more fully set forth in this opinion.

I. Facts and Procedural History

¶5       Roberson’s nine-year-old niece spent the evening at Roberson’s house. The next day, she reported to her mother that during the evening, Roberson had rubbed her "pee-pee." Based on these allegations,
Roberson was charged with sexual assault on a child by one in a position of trust, sexual assault on a child, and sexual assault (victim under 15).
¶6       At trial, Roberson defended against the charges by presenting evidence that he had a sleep sex disorder that would cause him to initiate sexual contact while he was sleeping. He testified that he never would
have consciously assaulted his niece and that he had no memory of the alleged incident. The jury ultimately found Roberson guilty as charged.
¶7       Thereafter, the probation department prepared a presentence investigation report. In this report, the department recommended that Roberson be placed on SOISP. The terms of the recommended SOISP included requirements
that:
(3) [Roberson] enter, attend and successfully participate in offensespecific treatment with [a Sex Offender Management Board ("SOMB")] approved sex offender treatment provider, as directed by his probation officer; [and]
(4) he submit to an index offense, sexual history disclosures, and routine maintenance polygraphs as deemed appropriate by the community supervisions team[.]
¶8       At the subsequent sentencing hearing, the prosecutor asked the court to adopt the probation department’s recommendations. The prosecutor observed, however, that very few people with Roberson’s level
of denial succeed on SOISP, and the prosecutor predicted that "there would be a reckoning" when Roberson would either admit what he did or face "far more severe consequences than [SOISP]."
¶9       At this point, the court interrupted and stated that it appeared that to be successful, "there has to be an acknowledgment." The prosecutor responded that "acknowledgement does not have to come now but it will have to come very soon . . . ."
¶10       Roberson’s counsel then made his sentencing argument, after which Roberson addressed the court. In the course of his statement, Roberson proclaimed his innocence and asserted prosecutorial misconduct
during his trial. The court then reminded Roberson what the prosecutor had said and explained that the prosecutor was prepared to go along with the probation department’s SOISP recommendation but that the prosecutor was concerned, based on Roberson’s
mental attitude, as to whether Roberson would follow the intensive supervision probation and acknowledge what had happened. The court added, "I’m just giving you a warning."
¶11       Roberson replied that he understood and would "cooperate and do what is necessary to be successful during this probation, during this intensive probation." The court then sentenced Roberson to SOISP for ten
years to life under the pertinent terms recommended by the probation department.
¶12       Thereafter, Roberson appealed his judgment and sentence to the Colorado Court of Appeals, see People v. Roberson, No. 11CA11 (Colo. App. Dec. 26, 2013) (not
published pursuant to C.A.R. 35(f)), and began participating in offense specific treatment. Because Roberson’s direct appeal was pending, however, his counsel advised him not to speak about anything that might be relevant to the case or that
might be used against him if his case went back to trial. Roberson shared this information with his probation officer and treatment providers.
¶13       Based on their discussions with Roberson, Roberson’s treatment providers placed him in a "modified sort of an appeal group," which allowed him to continue treatment without having to discuss his offense
or anything related to it. This process was interrupted, however, when in the course of a polygraph examination, the examiner asked Roberson questions about (1) his using or viewing child pornography while on probation and (2) sexual fantasies involving
minors within the prior six months, which was after he was placed on SOISP.[1] Roberson became concerned that the examiner was fishing for information that might be used to incriminate him. He thus asserted his Fifth Amendment right against self-incrimination and did not answer those questions.
¶14       As a result of Roberson’s refusal to answer, he was unable to meet the SOMB guidelines for successful compliance in sex offender treatment and was discharged from his treatment program. The probation
department then filed a complaint to revoke Roberson’s SOISP.
¶15       In a written order, the district court denied the revocation complaint. The court began by noting what it viewed as "three controlling factors in this case": (1) Roberson had asserted his Fifth Amendment right
against self-incrimination, and his fear of self-incrimination was reasonable in light of the prosecutor’s admission that on retrial, he would use available CRE 404(b) evidence; (2) Roberson’s case was on appeal, and he had testified at
trial (thus presenting a risk of perjury charges); and (3) Roberson had not been granted use immunity or provided with other assurances about the use of information that he provided during treatment.
¶16       In light of these factors, the court concluded that Roberson’s Fifth Amendment right against self-incrimination protected him from answering potentially incriminating questions in his treatment program.
The court based this conclusion on its belief that requiring Roberson either to answer incriminating questions or to assert his Fifth Amendment right against self-incrimination and risk having his probation revoked would impermissibly impose a substantial
penalty on Roberson for asserting his privilege against self-incrimination. Accordingly, the court concluded that Roberson’s probation could not be revoked based on his refusal to answer the questions at issue.
¶17       The People subsequently petitioned this court, pursuant to C.A.R. 21, for an order to show cause why the district court’s order should not be reversed. We issued the requested order, received full briefing,
and heard oral argument.
II. Original Jurisdiction
¶18       "Original relief pursuant to C.A.R. 21 is an extraordinary remedy that is limited in purpose and availability." People v. Steen, 2014 CO 9, ¶ 8, 318 P.3d
487, 490. Nonetheless, we will generally elect to hear C.A.R. 21 cases when they raise issues of first impression that are of significant public importance. Id. 
¶19       This case satisfies both of these criteria. First, we have not previously considered whether and under what circumstances an SOISP probationer’s invocation of the privilege against self-incrimination in the course of treatment precludes
a court from revoking the probationer’s SOISP for failure to participate actively in treatment. Second, the issue presented is an important one that implicates common SOISP conditions and impacts numerous convicted sex offenders who are undergoing
treatment while their convictions are on appeal.
III. Standard of Review
 
¶20       We review de novo the application of the Fifth Amendment to the undisputed facts in this case. See People v. Matheny, 46 P.3d 453, 462 (Colo. 2002) ("[L]aw application, which involves the application
of the controlling legal standard to the facts established by the evidence and found by the trial court is a matter for de novo appellate review, at least where constitutional rights are concerned."); see also People v. Ortega, 2015 COA 38, ¶ 8, ___ P.3d ___ (reviewing de novo the defendant’s contention that the trial court violated his privilege against self-incrimination).
 

IV. Analysis

¶21       The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, see Malloy v. Hogan, 378 U.S. 1, 6 (1964), guarantees that no person "shall
be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V; see also Colo. Const. art. II, § 18 ("No person shall be compelled to testify against himself in a criminal
case . . . ."). The Fifth Amendment not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, Minnesota v. Murphy, 465 U.S. 420, 426 (1984), but
also it "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings," Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). Moreover, a defendant does not lose his or her Fifth Amendment rights when he or she is convicted of a crime. Murphy, 465 U.S. at 426. Thus, a probationer retains these rights.
Id. 
¶22       These rights, however, are not unlimited. "The Fifth Amendment prohibits only compelled testimony that is incriminating." Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 189 (2004). Accordingly,
we first review whether (1) the polygraph examiner’s questions regarding Roberson’s post-trial conduct called for Roberson to provide incriminating information and (2) the circumstances in which the questions were put to Roberson amounted
to compulsion within the meaning of the Fifth Amendment. We then address the People’s argument that Roberson cannot rely on the Fifth Amendment at this stage but instead must wait until the government attempts to use his incriminating statements
against him at a future trial.

A. Incrimination

¶23       For Fifth Amendment purposes, the privilege against self-incrimination extends not only to answers that would themselves support a conviction but also to those that would furnish a link in the chain of evidence needed to prosecute the accused.
Ohio v. Reiner, 532 U.S. 17, 20 (2001); People v. Razatos, 699 P.2d 970, 976 (Colo. 1985). Accordingly, "[t]he right not to incriminate oneself is not
triggered solely by the existence or even likelihood of a criminal prosecution; rather, ‘[w]hen a witness can demonstrate any possibility of prosecution which is more than fanciful he has demonstrated a reasonable fear of prosecution sufficient
to meet constitutional muster.’" Steiner v. Minn. Life Ins. Co., 85 P.3d 135, 142–43 (Colo. 2004) (quoting In re Folding Carton Antitrust Litig., 609 F.2d 867, 871 (7th Cir. 1979)).
¶24       Here, for two reasons, we conclude that Roberson’s answer to the polygraph examiner’s question regarding his use or viewing of child pornography while he was on probation presented a possibility of prosecution that was more than fanciful.
¶25       First, at the time of the probation revocation hearing, Roberson’s convictions were on appeal. Thus, any statements that Roberson made would have been available for use against him at a retrial. See People v. Villa, 671 P.2d 971, 973 (Colo. App. 1983) ("[W]hen a defendant is appealing his conviction, or seeking other post-conviction relief, the privilege continues in order to protect him from the subsequent use of self-incriminating statements in the event relief
is granted."); Martin v. Flanagan, 789 A.2d 979, 984 n.4 (Conn. 2002) (noting that the weight of authority allows a witness whose conviction has not been finalized on direct appeal to invoke the privilege
and to refuse to testify about the subject matter that formed the basis of his or her conviction and collecting cases); see also § 16-10-301(3), C.R.S. (2015) (providing that in cases accusing
a defendant of certain offenses involving unlawful sexual conduct, the prosecution "may introduce evidence of other acts of the defendant to prove the commission of the offense as charged for any purpose other than propensity").
¶26       Second, Roberson’s answer to the polygraph examiner’s question as to whether he used or viewed child pornography while he was on probation could have established grounds for a new criminal charge of possession of child pornography.
See United States v. Behren, 65 F. Supp. 3d 1140, 1150 (D. Colo. 2014) ("Facing questions which ask about sex with minors, forced sex, or other similar categories, anything but a ‘no’ answer
poses a real risk of incrimination.").
¶27       Accordingly, we conclude that Roberson’s answer to the polygraph examiner’s question regarding his use or viewing of child pornography while he was on probation, could have furnished a link in the chain of evidence needed to prosecute
him and was therefore incriminating within the meaning of the Fifth Amendment. See Reiner, 532 U.S. at 20; Razatos, 699 P.2d at 976.
¶28       On the record before us, however, we are unable to determine whether Roberson’s answer to the polygraph examiner’s question regarding any sexual fantasies involving minors that Roberson might have had within the preceding six months
would also have been incriminating within the meaning of the Fifth Amendment.
¶29       Whether a question poses a reasonable danger of incrimination involves a fact-intensive inquiry. See Rogers v. United States, 340 U.S. 367, 374 (1951). Here, it is undisputed that the examiner’s
question regarding any sexual fantasies involving minors that Roberson might have had in the preceding six months related to a time period after Roberson’s trial was over. Whether Roberson’s answer to this question would have been admissible
in a subsequent retrial and thus would have been incriminating is unclear, and the district court did not make sufficient findings to allow us to decide this issue.

B. Compulsion
 
¶30       We next address whether the circumstances in which the questions at issue were put to Roberson amounted to compulsion. See Hiibel, 542 U.S. at 189. We address this issue because absent compulsion,
Roberson would not have a viable Fifth Amendment claim regardless of whether the polygraph examiner’s questions at issue were incriminating. See id. 
¶31       The United States Supreme Court has indicated that testimony is compelled when the state threatens to inflict "potent sanctions unless the constitutional privilege is surrendered." Lefkowitz v. Cunningham, 431 U.S. 801, 805 (1977). Similarly, when a state imposes "substantial penalties" on a witness because he or she has elected to exercise his or her Fifth Amendment rights, the state’s action amounts to compulsion. See id. 
¶32       Not every penalty, however, constitutes compulsion within the meaning of the Fifth Amendment. See McKune v. Lile, 536 U.S. 24, 44 (2002) (plurality opinion) ("[O]ne cannot answer the question whether
the person has been compelled to incriminate himself without first considering the severity of the consequences."); id. at 49 (O’Connor, J., concurring) ("[S]ome penalties are so great as to ‘compe[l]’
. . . testimony, while others do not rise to that level.").
¶33       The question presented here is whether threatening Roberson with the revocation of his probation based on the proper invocation of his Fifth Amendment rights amounted to compulsion. In the circumstances presented here, we conclude that it did.
¶34       The United States Supreme Court’s decision in Murphy is instructive. In Murphy, 465 U.S. at 422, the terms of the defendant’s probation
required that he be truthful with his probation officer in all matters. In responding to questions from his probation officer, the defendant admitted that he had committed a rape and murder. Id. at
423–24. He was subsequently charged with murder, and he sought to suppress his confession on the ground that it was obtained in violation of the Fifth and Fourteenth Amendments. Id. at 425.
¶35       The Supreme Court ultimately rejected the defendant’s argument. Id. at 434–39. The Court began by referencing its prior cases, which had made clear that a state may not impose substantial
penalties on a witness who elects to invoke his or her Fifth Amendment right against self-incrimination. Id. at 434. The Court noted a distinction, however, between cases in which punishment is threatened
for reliance on the privilege and cases in which a witness is merely required to appear and give testimony. Id. at 435. A state may require a probationer to appear and discuss matters relating to his
probation, and such a requirement would not alone give rise to a self-executing privilege. Id. The Court observed, however, that the result might be different if the questions put to the probationer,
no matter how relevant to his or her probationary status, would call for answers that would incriminate the probationer in a pending or later criminal prosecution. Id. The Court thus explained:
There is . . . a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that invocation of the privilege [against self-incrimination] would lead to revocation of probation, it would have created the
classic penalty situation, the failure to assert the privilege would be excused, and the probationer’s answers would be deemed compelled and inadmissible in a criminal prosecution.
Id. 
¶36       The question thus became whether the defendant’s probation conditions merely required him to appear and testify about matters relevant to his probationary status, which would not have violated his Fifth Amendment rights, or whether the
conditions went further and required the defendant to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. Id. at 436. On the facts before it,
the Court concluded that the case fell into the former category. Id. 
¶37       The Court reached this conclusion for several reasons. First, the probation condition at issue said nothing about the defendant’s freedom to decline to answer particular questions on Fifth Amendment grounds. Id. at 437. Nor did the probation condition require him to waive his Fifth Amendment privilege. Id. Second, the Court noted that there was no direct evidence that the defendant had confessed because he
feared that his probation would be revoked if he remained silent. Id. And third, the defendant was not expressly informed by his probation officer that the assertion of the privilege would result in
the imposition of a penalty. Id. at 438.
¶38       The Court further opined that had the defendant harbored some belief that his probation might be revoked for exercising his Fifth Amendment privilege, that belief would have been unreasonable because "[o]ur decisions have made clear that the
State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." Id. 
¶39       The present case involves the type of classic penalty situation that the Court found absent in Murphy. Specifically, at least as construed by the People, the probation conditions at issue here
required Roberson to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. Moreover, the People here expressly sought to revoke Roberson’s probation based on the exercise of his Fifth Amendment
rights. Prior to the polygraph examination at issue, Roberson advised his probation officer and treatment providers of his Fifth Amendment concerns. As a result, Roberson was placed in an appeal group in which he would not have to incriminate himself
while his appeal was pending. Nonetheless, in the course of a polygraph examination, Roberson was asked at least one incriminating question. He then asserted his Fifth Amendment rights, and his invocation of that privilege resulted in his termination
from treatment and the People’s subsequent effort to revoke his probation.
¶40       In these circumstances, we conclude that the district court correctly found that requiring Roberson to respond to incriminating questions from the polygraph examiner would amount to compelled self-incrimination, such that Roberson’s probation
could not be revoked on those grounds.
¶41       We are not persuaded otherwise by the People’s argument that the above-quoted passages in Murphy were dicta. To the contrary, those passages were central to the Court’s analysis, and
cases from numerous jurisdictions have expressly or implicitly followed Murphy’s admonition that the state cannot revoke a defendant’s probation for a valid invocation of his or her privilege
against self-incrimination. See, e.g., United States v. Antelope, 395 F.3d 1128, 1139 (9th Cir. 2005); Mace v. Amestoy, 765 F. Supp. 847, 852 (D. Vt.
1991); James v. State, 75 P.3d 1065, 1072 (Alaska Ct. App. 2003); State v. Eccles, 877 P.2d 799, 800–01 (Ariz. 1994); Gilfillen v. State, 582 N.E.2d 821, 824 (Ind. 1991); State v. Kaquatosh, 600 N.W.2d 153, 158 (Minn. Ct. App. 1999); State v. Fuller, 915 P.2d 809, 815 (Mont. 1996);
In re Interest of A.M., Jr., 797 N.W.2d 233, 260 (Neb. 2011); State v. Gaither, 100 P.3d 768, 772 (Or. Ct. App. 2004); State ex rel. Tate v. Schwarz, 654 N.W.2d 438, 445–46 (Wis. 2002).
¶42       Nor are we persuaded by the People’s contentions that the circumstances here did not amount to unconstitutional compulsion because (1) Roberson voluntarily sought and accepted probation; (2) additional incarceration does not necessarily
amount to compulsion; (3) once the probation department sought to revoke Roberson’s probation, Roberson received a fair criminal process and his revocation was not automatic; and (4) the probation revocation at issue was not designed to punish
Roberson for exercising his Fifth Amendment rights. We address each of these arguments in turn.
¶43       First, the People argue that Roberson voluntarily sought and accepted probation, and the People suggest that under cases like Dzul v. State, 56 P.3d 875, 879–86 (Nev.2002), and State v. Pritchett, 69 P.3d 1278, 1286–87 (Utah 2003), a grant of probation can be conditioned on the defendant’s admitting culpability for his or her conviction. There is a "crucial distinction," however, between "being deprived of a liberty one has, as
in parole, and being denied a conditional liberty that one desires." Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 9 (1979). Thus, although a defendant has no due process rights
in probation that has not yet been granted, once granted, he or she has due process rights in its revocation. See People v. Whitlock, 2014 COA 162, ¶ 33, ___ P.3d ___ (stating that "a person who
is applying for probation is in a different situation from a person who has been sentenced to probation" because a person sentenced to probation "has attained a ‘liberty interest,’ which may not be taken away from him in the absence of
due process"). Accordingly, even if the privilege of probation could properly be denied based on a defendant’s invocation of the privilege against self-incrimination, see, e.g., Whitlock, ¶ 37, Murphy and its progeny make clear that probation cannot be revoked for such an invocation, see, e.g., Murphy, 465 U.S. at 435, 438; Antelope, 395 F.3d at 1139; Mace, 765 F. Supp. at 852; James, 75 P.3d at 1072;
Eccles, 877 P.2d at 800–01; Gilfillen, 582 N.E.2d at 824; Kaquatosh, 600 N.W.2d at 158;
Fuller, 915 P.2d at 815; A.M., Jr., 797 N.W.2d at 260; Gaither, 100 P.3d at 772; Schwarz, 654 N.W.2d at 445–46.
¶44       Second, the People argue that the penalty of additional incarceration does not necessarily amount to compulsion, analogizing this case to cases in which (1) incarcerated prisoners who refused to participate in a prison’s sex offender treatment
program were either denied parole or faced a reduced likelihood of parole, see Ainsworth v. Stanley, 317 F.3d 1, 6 (1st Cir. 2002); Doe v. Sauer, 186
F.3d 903, 906 (8th Cir. 1999); (2) incarcerated prisoners lost privileges and good time credits, see Searcy v. Simmons, 299 F.3d 1220, 1226–27 (10th Cir. 2002); and (3) a prisoner’s supervised
home release status was terminated, see Asherman v. Meachum, 957 F.2d 978, 983 (2d Cir. 1992). These cases are inapposite, however, because they did not involve defendants who were on probation.
¶45       Moreover, because "parole is more akin to imprisonment than probation is to imprisonment," Samson v. California, 547 U.S. 843, 850 (2006), the prospect of having parole revoked has been deemed
less likely to compel an incriminating statement than the prospect of having probation revoked, see Bleeke v. Lemmon, 6 N.E.3d 907, 938–40 (Ind. 2014) (noting that "the revocation of [the defendant’s]
parole does not mean he goes from being at full liberty to being fully detained, as he portrays it—instead it means he goes from being detained at a comparatively low level back to being fully detained," and thus the threat of revocation of
parole for failure to comply with a sex offender treatment program does not amount to compulsion in violation of the Fifth Amendment).2
¶46       And many of the cases cited by the People involved the denial of a conditional liberty interest that the defendant desired, as opposed to the deprivation of a liberty interest that he or she had already attained. See, e.g., Ainsworth, 317 F.3d at 5–6 (noting that inmates do not have a liberty right to parole and thus concluding that a reduced likelihood of parole for refusing to participate in sex offender treatment did not constitute a penalty sufficient to compel incriminating
speech in violation of the Fifth Amendment); Searcy, 299 F.3d at 1226 ("[F]oreclosing [the defendant] from the mere opportunity to earn good time credits
is not a new penalty, but only the withholding of a benefit that the [Department of Corrections] is under no obligation to give.").
¶47       Third, relying on McKune, the People argue that when, as here, the consequences that a defendant faces for invoking his or her Fifth Amendment rights are not automatic but rather occur only after
a fair criminal process, those consequences do not amount to compulsion. In McKune, 536 U.S. at 43–44 (plurality opinion), however, the plurality expressly rejected the defendant’s argument
that the automatic nature of the consequences resulting from his refusal to participate in treatment was dispositive as to whether he was compelled to incriminate himself. Id. at 43–44 (plurality
opinion). In our view, the non-automatic nature of the consequences in this case is no more dispositive. Moreover, although Justice O’Connor expressed the view that the "proper theory" for determining
the constitutionality of compulsion should "recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process," id. at 53 (O’Connor, J., concurring), no other justice subscribed to this theory, and we decline to adopt it here.
¶48       Fourth, the People argue that the state could revoke Roberson’s probation because the revocation was not designed to punish Roberson for exercising his Fifth Amendment rights but instead was motivated by the state’s legitimate interest
in facilitating sex offender treatment. The United States Supreme Court, however, has "rejected the notion that citizens may be forced to incriminate themselves because it serves a governmental need." Cunningham, 431 U.S. at 808. Indeed, in McKune, 536 U.S. at 33–45 (plurality opinion); id. at 55–56, 68 (Stevens, J., dissenting), although the plurality
and the dissent both appear to have recognized that requiring a sex offender in treatment to admit responsibility and to state his or her sexual history serves the legitimate purpose of rehabilitating sex offenders, both opinions proceeded to address
whether the consequences that the defendant was facing amounted to compulsion under the Fifth Amendment. Accordingly, McKune at least implicitly rejected the argument that probation can be revoked based
on a probationer’s assertion of the Fifth Amendment privilege as long as the government has a legitimate interest in facilitating treatment.
¶49       For these reasons, we conclude that to the extent the polygraph examiner’s questions called for Roberson to provide incriminating information within the meaning of the Fifth Amendment, requiring Roberson either to provide that information
or to face revocation of his probation amounted to unconstitutional compulsion.

C. Use in a Criminal Trial

¶50       In the alternative, the People cite Chavez v. Martinez, 538 U.S. 760 (2003) (plurality opinion), for the proposition that Roberson cannot rely on the Fifth Amendment at this stage but instead must
wait until the government tries to use incriminating statements against him at a criminal trial. We are not persuaded.
¶51       In Chavez, 538 U.S. at 764, a suspect made incriminating statements in response to police questioning, but he was never charged with a crime. The suspect nonetheless filed a civil lawsuit, pursuant
to 42 U.S.C. § 1983, against the officer who had interrogated him. Id. at 764–65. In this lawsuit, the suspect alleged that the officer’s actions violated his Fifth Amendment rights.
Id. at 765. The United States Supreme Court concluded that the facts presented did not support a viable section 1983 claim. See id. at 772–73 (plurality
opinion); id. at 777–78 (Souter, J., concurring).
¶52       Although the Chavez plurality stated in passing that it is not until compelled statements are used in a criminal trial that a violation of the Self-Incrimination Clause occurs, only four justices
joined this portion of the opinion. See id. at 767 (plurality opinion). Moreover, nothing in Chavez appears to have altered the established principle
that "a witness protected by the privilege [against self-incrimination] may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case
in which he is a defendant." Turley, 414 U.S. at 78. To the contrary, writing for the plurality, Justice Thomas stated, "Because the failure to assert the privilege will often forfeit the right to exclude
the evidence in a subsequent ‘criminal case,’ it is necessary to allow assertion of the privilege prior to the commencement of a ‘criminal case’ to safeguard the core Fifth Amendment trial right." Chavez, 538 U.S. at 771 (plurality opinion) (citations omitted).
¶53       In light of the foregoing, other courts have rejected arguments similar to the one that the People advance here. See, e.g., Antelope, 395 F.3d at 1140 (rejecting the government’s argument
that it had "the right to compel [the defendant] to incriminate himself, prosecute him, and force him to litigate the admissibility of each piece of evidence in future criminal proceedings" because it was only then that the defendant could properly
assert his Fifth Amendment privilege); Bleeke, 6 N.E.3d at 926–27 (rejecting the argument that because a Fifth Amendment violation can occur only when an incriminating statement is used against
a defendant in a criminal trial, the defendant’s attempt to challenge a sex offender treatment program on self-incrimination grounds was not ripe).
¶54       As the Bleeke court observed:
Taking analysis out of [the section 1983] context and applying it as the rule for when a defendant may properly invoke the Fifth Amendment’s privilege, as the Parole Board
seeks to do, would have far greater (and worse) implications. In fact, it would effectively vitiate the Fifth Amendment privilege entirely because a defendant could not claim the protection of the Fifth
Amendment—only, later, a violation of the Fifth Amendment. He or she could not refuse to answer a question because the response would be self-incriminating; a defendant could only later seek to
have that response excluded in Court and a violation would only occur if the trial court refused that request.
This is contrary to the greater wealth of U.S. Supreme Court case law on the subject.
Bleeke, 6 N.E.3d at 926–27; see also Antelope, 395 F.3d at 1140 ("[A]doption of the government’s position would all but eviscerate the protections
the self-incrimination clause was designed to provide.").
¶55       We agree with this reasoning and thus conclude that Roberson did not need to wait until the government tried to use incriminating statements against him at a subsequent criminal trial to invoke his Fifth Amendment privilege.
 

V. Conclusion and Remand Order

¶56       For these reasons, we conclude that the district court correctly found that Roberson’s privilege against self-incrimination precluded the court from revoking Roberson’s probation based on his refusal to answer the polygraph examiner’s
question regarding his use or viewing of child pornography while he was on probation. On the record before us, however, we are unable to determine whether the court correctly found that Roberson’s privilege against self-incrimination precluded
the court from revoking Roberson’s probation based on his refusal to answer the examiner’s questions regarding any post-trial sexual fantasies involving minors that Roberson might have had.
¶57       Accordingly, we make the rule to show cause absolute and remand this case to the district court with instructions that the court make specific findings as to whether Roberson demonstrated a reasonable fear that the polygraph examiner’s
question regarding sexual fantasies would elicit an incriminating response. In making such findings, the court should bear in mind that not all answers to sexually oriented questions in the course of sex offender treatment are necessarily incriminating.
Indeed, to conclude otherwise would virtually preclude sex offender treatment during the pendency of a convicted offender’s direct appeal, which would be contrary to the General Assembly’s expressed intention that sex offenders who are
incarcerated or supervised receive treatment, both to ensure public safety and to facilitate the reintegration into society of those offenders who respond well to treatment. See § 18-1.3-1001,
C.R.S. (2015).
¶58       If the court finds that Roberson demonstrated a reasonable fear that the polygraph examiner’s question regarding post-trial sexual fantasies involving minors would elicit an incriminating response, then the court’s order denying the
People’s revocation complaint shall stand affirmed. If, however, the court finds that Roberson did not properly invoke his Fifth Amendment privilege in response to the question regarding sexual fantasies, then the court must proceed to determine,
in its discretion, whether revocation of Roberson’s probation is appropriate on the facts of this case. In making this determination, the court may conduct such further proceedings as the court deems necessary and appropriate.
JUSTICE COATS dissents, and JUSTICE EID joins in the dissent.
 
 

JUSTICE COATS, dissenting.

¶59       Because I believe the district court erred in concluding that revoking the defendant’s probation for refusing to answer the questions posed to him, as alleged in the complaint, would violate his Fifth Amendment privilege against self-incrimination,
I respectfully dissent. In particular, I disagree with the majority’s analysis of the Fifth Amendment compulsion question or, more to the point for a case in which no incriminating statements were ever made, the question whether the imposition
of any given consequence for asserting the privilege against self-incrimination would amount to a prohibited penalty. Given the extremely unsettled state of United States Supreme Court jurisprudence in this area in general, and concerning the applicability
of the privilege to the treatment of convicted sex offenders in particular, I would not leap to characterize revocation of probation, in and of itself, as a prohibited "substantial penalty" for a probationer’s refusal to merely answer forthrightly
whether he has violated a condition of his probation by possessing child pornography.
¶60       The majority’s conclusion to the contrary appears to me to rest entirely on a hypothetical example offered by the Supreme Court, over thirty years ago, suggesting a situation in which, in contradistinction to the case actually before it,
the privilege against self-incrimination might be considered self-executing and, therefore, not have to be asserted at all. See Minnesota v. Murphy, 465 U.S. 420, 435 (1984). In holding that the probationer’s
privilege in the case actually before it was not self-executing, and therefore did have to be invoked to be relied on, the Court indicated that the result of its analysis "may be different" if the questions put to him called for answers that would
be incriminating; and that there was a "substantial basis" in the Court’s cases for concluding that if the state indicated that invocation of the privilege would lead to revocation of probation, the failure of the probationer to assert the privilege
would be excused and his answers would be deemed compelled and inadmissible in a criminal prosecution. Id. Ultimately, however, the Court did not conclude that the result would be different under those
circumstances because it found instead that in the case before it the state had taken none of the steps it identified as drawing into question whether the result might be different. See id. at 436.
¶61       The majority simply takes the Court’s query in Murphy as a binding conclusion and moves directly to explaining why today’s case is not meaningfully distinguishable from the hypothetical
posed there. With regard to pronouncements of the United States Supreme Court in particular, I generally find it unhelpful to debate the question whether portions of the published opinions of a higher court represent dicta rather than part of the
ratio decidendi itself, and are therefore technically not binding on lower courts. I therefore do not suggest that we should ignore the clear import of Supreme Court pronouncements, no matter how unnecessary
they may have been to the outcome of the proceeding, but rather that in Murphy the Supreme Court never purported to specify circumstances in which a probationer’s answers to questions would necessarily
be compelled, and thereby make the privilege self-executing, much less to identify consequences constituting a constitutionally prohibited "substantial penalty" for asserting the privilege. In Murphy, to make its point about the situation actually at issue, the Court simply juxtaposed that situation with one in which the result "may be different." Id. at 435.
¶62       Although the probationer in Murphy was also subjected to sex offender treatment, the statements at issue there were made to a probation officer, outside any treatment program, and clearly did not
implicate a refusal to answer incriminating questions as part of sex offender treatment. By contrast, eighteen years later, in McKune v. Lile, 536 U.S. 24 (2002), the Supreme Court was directly faced
with the question whether a prisoner’s Fifth Amendment privilege was violated by transferring him to a maximum-security unit, with the accompanying loss of privileges and liberty that transfer entailed, for refusing to participate in a Sexual
Abuse Treatment Program on the ground that it would have required disclosures of his criminal history. A four-justice plurality would not only have found an absence of unconstitutional compulsion, see id. at 35, but, in addition, described what it considered the proper inquiry concerning a "substantial penalty" as being whether the consequences of the inmate’s choice to remain silent were closer to the physical torture against which the Constitution
clearly protects or the de minimis harms against which it does not, id. at 41.
¶63       A fifth justice, who also would have found no unconstitutional compulsion, offered a different standard for making this determination, largely finding constitutional the imposition of virtually any consequence or punishment for remaining silent,
as long as the actual imposition was accomplished through a fair criminal process. See id. at 53 (O’Connor, J., concurring). Importantly, however, Justice O’Connor, as the fifth justice,
made clear that she would uphold the penalties assessed against the convict in that case for the reason that they were not compulsive under any reasonable test. See id. at 48–52.
¶64       While I agree with the majority that Justice O’Connor’s proposal for a comprehensive method of evaluating the constitutionality of penalties imposed upon the exercise of the privilege did not carry the day, her conclusion that the
penalty imposed in McKune was not unconstitutionally compulsive under any reasonable test, as the narrowest ground for the judgment of reversal in that case, did represent the holding of the court.
See Marks v. United States, 430 U.S. 188, 193 (1977); see also People v. Schaufele, 2014 CO 43, ¶ 64 n.3, 325 P.3d 1060, 1073 n.3 (Eid, J., concurring).
I believe the majority can reconcile its reading of Murphy with this holding of McKune only by assuming that the Court intended a clean, but unspoken,
demarcation between the treatment of sex offenders in prison and the identical treatment of sex offenders as a condition of probation. By contrast, I understand McKune as implying, at least partially,
an answer to the suggestion left unresolved in Murphy: Some further infringement on the liberty of a convicted sex offender is not necessarily a constitutionally prohibited "substantial penalty" for
refusing to answer incriminating questions that are essential for the sex offender’s rehabilitation.
¶65       While McKune addressed a sex abuse treatment program offered in prison, I believe both the plurality opinion and separate opinion of Justice O’Connor apply equally to similar treatment programs
for probationers. In particular, unlike the so-called "penalty cases," both probationers and prisoners have already been convicted of crimes. Both situations involve the same legitimate penological interest in rehabilitation, which, as the Supreme
Court has emphasized in the past, must be weighed against the exercise of a criminal convict’s liberty. See, e.g., O’Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). Also unlike the
penalty cases, the principle of accepting responsibility as the beginning of rehabilitation, which applies equally whether the convict is in prison or has avoided prison by agreeing in advance to accept responsibility as a condition of probation,
runs counter to any grant of immunity, which would deprive acceptance of its beneficial effect.
¶66       Both opinions forming the majority in McKune expressed concern for the constitutional validity of both state and federal sentencing considerations and practices taking into account the acceptance
of responsibility for purposes of sentencing, probation, or preferential treatment in various penal and rehabilitation programs, if the differential treatment of those admitting and those not admitting their crimes can constitute a "substantial penalty"
for Fifth Amendment purposes. See 53 U.S. at 47; id. at 53 (O’Connor, J., concurring). A benefit for one who accepts responsibility can easily
be cast as a penalty imposed upon another who refuses to do so.
¶67       As we have often noted in the past, probation is fundamentally rehabilitative in nature, and in order to best serve the ends of justice and the interests of the public, the probationary power of the courts must retain flexibility. See, e.g., People v. Guatney, 214
P.3d 1049, 1052 (Colo. 2009). The conditions of any probation must be voluntarily accepted by the prospective probationer, and notwithstanding a violation of those conditions, revocation of probation always remains within the discretion of the court.
Id. Similarly, unless the probationer commits a new crime making him ineligible, the court retains the power to re-grant probation on different, and perhaps more onerous, conditions better suited to
the probationer’s rehabilitation and protection of the public following a decision to revoke. Because the revocation of probation can mean so many different things and have such a wide range of impacts on the liberty interests of a convicted
defendant, just as can changing the conditions of confinement of a prisoner, I believe it to be conceptually premature to categorize the revocation of probation, in and of itself, as an unconstitutional penalty for refusing to answer questions integral
to sex offender rehabilitation, whether or not the answers may be incriminating.
¶68       Finally, I note that a convicted sex offender is hardly stripped of due process by being forced to choose between the provisional liberty of probation and rehabilitating himself, even at the cost of self-incrimination. In this jurisdiction, quite
apart from constitutional limitations, both the granting and revocation of probation are subject to extensive procedural safeguards. See Guatney, 214 P.3d at 1051–52. With regard to the nature
and extent of self-incrimination permissibly required as a condition of probation, it is also far from clear that the legislative requirement to "participate" in sex offender treatment contemplates mandatory self-incrimination, see §§ 18-1.3-1007(2), -1008(1), C.R.S. (2015); and even if so, that the statute contemplates revocation, rather than simply an inability to successfully complete probation until the probationer is able to admit and discuss his crime. And if
not statutorily mandated, the question whether it is within the discretion of a trial court to make successful rehabilitation a condition of probation is itself subject to exacting standards. See People v. Brockelman, 933 P.2d 1315, 1319 (Colo. 1997).
¶69       For all of these reasons, I would make the rule absolute and return the matter for consideration of any remaining disputed issues and the district court’s ultimate exercise of discretion concerning the defendant’s probationary status.
I therefore respectfully dissent.
I am authorized to state that JUSTICE EID joins in this dissent.

 [1] The parties do not dispute that the conduct about which the examiner inquired would have occurred, if at all, post-trial and while Roberson was on probation.

[2]
 The People also rely on United States v. Robinson, 893 F.2d 1244 (11th Cir. 1990) (per curiam). To the extent that the two-page per curiam opinion in Robinson is contrary to our holding here, we do not follow it because we view it as inconsistent with Murphy and with the substantial number of cases cited above that have followed Murphy and that have reached the same result that we reach in this case.