**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ALEXANDER ORIHO, DBA Rhino's Med. Trans, LLC, *Defendant-Appellant.* | No. 19-10291 D.C. No. 2:19-cr-00667-DJH-1 OPINION |

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted July 13, 2020
San Francisco, California

Filed August 10, 2020

Before: Eugene E. Siler,[*] Richard C. Tallman, and
Danielle J. Hunsaker, Circuit Judges.

Opinion by Judge Tallman

---

[*] The Honorable Eugene E. Siler, Senior United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY**

### Criminal Law

The panel vacated the district court's order requiring the defendant, who was indicted on healthcare fraud and money laundering charges, to repatriate any proceeds of the fraudulent scheme that he may have transferred to an African bank during a three-year period, up to $7,287,000, in order to preserve funds for potential forfeiture.

The panel determined that it had jurisdiction under 28 U.S.C. § 1292(a)(1) to review the interlocutory order, which was issued under the authority of 21 U.S.C. § 853.

The panel held that, as currently written, the repatriation order violates the defendant's Fifth Amendment privilege against self-incrimination. The panel concluded (1) that the order compels the defendant to incriminate himself by personally identifying, and demonstrating his control over, untold amounts of money located in places the government may not presently know about; (2) that the district court failed to apply the proper "forgone conclusion" exception test, relieving the government of its obligation to prove its prior knowledge of the incriminating information that may be implicitly communicated, thereby allowing the government to shirk its responsibility to discover its own evidence; and (3) that the government's narrow promise of limited use immunity is insufficient to counterbalance these harms.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel remanded with instructions to conduct an evidentiary hearing designed to elicit from the government evidence supporting a more limited repatriation order. The panel instructed that if the evidence satisfies the proper foregone conclusion test, the district court will also need to ascertain whether the government must offer broader immunity to sufficiently protect the defendant's Fifth Amendment privilege by ordering strict compliance with 18 U.S.C. §§ 6001–03.

## COUNSEL

Daniel L. Kaplan (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Defendant-Appellant.

Rachel Cristina Hernandez (argued) and Mark J. Wenker, Assistant United States Attorneys; Krissa M. Lanham, Appellate Chief; Michael Bailey, United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

Alexander Oriho, who was indicted on healthcare fraud and money laundering charges, challenges a pre-trial repatriation order entered by the district court as a violation of his Fifth Amendment privilege against self-incrimination. To preserve funds for potential forfeiture, the order requires Oriho to repatriate any proceeds of the fraudulent scheme that he may have transferred to any African bank during a three-year period, up to $7,287,000, despite the indictment alleging that he transferred only $760,000 to two specific banks in Uganda and Kenya. The district court reasoned that no compelled self-incrimination would result from the order, and even if such a risk existed, it was obviated by the government's claims that it already knew Oriho had transferred some of the money to Africa. The order also rested on a promise from the government that it "will not introduce evidence that [Oriho] repatriated funds from Africa in its case-in-chief."

The district court was presented with difficult issues of first impression, but we conclude that the challenged order compels Oriho to incriminate himself by personally identifying, and demonstrating his control over, untold amounts of money located in places the government may not presently know about. We also conclude that the district court failed to apply the proper "foregone conclusion" exception test, relieving the government of its obligation to prove its prior knowledge of the incriminating information that may be implicitly communicated by repatriation. The order thereby allows the government to shirk its responsibility to discover its own evidence. The government's narrow promise of limited use immunity is insufficient to counterbalance these harms. We vacate and

remand with instructions to conduct an evidentiary hearing designed to elicit from the government evidence supporting a more limited repatriation order.  If the evidence satisfies the proper foregone conclusion test, the district court will also need to ascertain whether the government must offer broader immunity to sufficiently protect Oriho's Fifth Amendment privilege by ordering strict compliance with 18 U.S.C. §§ 6001–03.

I

In June 2019, the government filed a 43-count indictment against Oriho, charging him with healthcare fraud, identity theft, and unlawful transfers of the proceeds of those activities to Kenya and Uganda.  The charges stem from Oriho's ownership of a company called Rhino Med. Trans, LLC, which has been in operation since 2012.  Rhino Med. is approved to receive government funds from the Arizona Health Care Cost Containment System (AHCCCS), Arizona's Medicaid program administrator, for non-emergency medical transportation services for indigent residents.

The indictment alleges that Oriho began billing AHCCCS for "thousands of false transport claims that never occurred or were inflated and fabricated to augment his reimbursements."  Evidence against Oriho includes multiple submissions with identical odometer readings and billing information, and records of invalid transport addresses.  The indictment reflects the government's belief that Oriho submitted around 105,000 false claims between January 1, 2016, and the return of the indictment on June 5, 2019, which generated approximately $7,287,000 in fraudulent payments from AHCCCS to Oriho.

The first thirty counts of the indictment allege fraudulent healthcare reimbursement submissions. The following six counts charge use of the healthcare identification numbers of others. But this interlocutory appeal chiefly relates to the final group of charges, excerpted below. Counts 37–43 allege seven transfers of "criminally derived" funds from Bank of America account #X1850, to KCB and Stanbic bank accounts in Uganda and Kenya, in violation of 18 U.S.C. § 1957 (money laundering).

| Ct | Date | Monetary Transaction | Amount |
|----|------|----------------------|--------|
| 37 | 07/13/2017 | Wire transfer from Bank of America account #X1850 to a Stanbic Bank account in Uganda. | $110,000 |
| 38 | 12/28/2017 | Wire transfer from Bank of America account #X1850 to a KCB Bank account in Uganda. | $110,000 |
| 39 | 01/08/2018 | Wire transfer from Bank of America account #X1850 to a KCB Bank account in Uganda. | $110,000 |
| 40 | 04/17/2018 | Wire transfer from Bank of America account #X1850 to a Stanbic Bank account in Kenya. | $120,000 |
| 41 | 06/14/2018 | Wire transfer from Bank of America account #X1850 to a Equity Bank account in Uganda. | $80,000 |
| 42 | 06/14/2018 | Wire transfer from Bank of America account #X1850 to a Stanbic Bank account in Kenya. | $110,000 |
| 43 | 09/04/2018 | Wire transfer from Bank of America account #X1850 to a Stanbic Bank account in Uganda. | $120,000 |

It is not detailed in the indictment, but the government stated in its motion filed with the district court in support of the repatriation order that it believes Oriho owns Bank of America account #X1850, while five of the receiving accounts also belong to him personally and two belong to "Rhino's Investments Group Limited, an entity the government believes [Oriho] owns or controls." The transfers alleged in these counts total $760,000.

Only a few weeks after filing the indictment, the government moved under the Comprehensive Forfeiture Act, 21 U.S.C. § 853(e), for a district court order requiring Oriho to repatriate any funds currently in Africa and deposit them with the United States Marshals Service as the custodian, to ensure their availability for criminal forfeiture

if Oriho is found guilty. Though only the seven wire transfers from Counts 37–43 were included in the indictment, the government's motion broadly states, without a supporting declaration or further citation to accounts or locations, that "based on what the government currently knows, defendant wired approximately $2,400,000 to Africa since January 1, 2016." Oriho opposed the motion on the basis that it would violate his Fifth Amendment privilege against self-incrimination because the requested repatriation order "would be compelling [Oriho] to engage in monetary transactions, authenticate certain evidence, and produce an evidentiary trail that the Government could use in its efforts to convict [him]."

The district court granted the motion for repatriation of up to $7,287,000, reasoning that there would be no testimonial self-incrimination because the government was already aware that Oriho had transferred approximately $2,400,000 to African countries, so it would not gain any new information as a result of the order. Addressing any lingering Fifth Amendment concerns, the court noted that it intends to hold the government to its assurance that it "will not introduce evidence that [Oriho] repatriated funds from Africa in its case-in-chief." Oriho filed a motion for reconsideration, making essentially the same Fifth Amendment argument and asking for broader immunization from the government against use of information gained from the repatriation "for any purpose in any prosecution" against him, which the district court also denied. This appeal followed.[1]

---

[1] The case is currently proceeding in district court with trial set for February 16, 2021. Oriho moved to stay the repatriation order pending appeal, but the motion was denied. Our motions panel likewise denied

II

We conduct de novo review of jurisdictional questions, *United States v. Romero-Ochoa*, 554 F.3d 833, 835 (9th Cir. 2009), and "potential violations of the Fifth Amendment," *United States v. Hulen*, 879 F.3d 1015, 1018 (9th Cir. 2018). In deciding whether the district court properly deemed the existence of documents a "foregone conclusion" for Fifth Amendment purposes, we review for clear error. *United States v. Bright*, 596 F.3d 683, 690 (9th Cir. 2010).

A

We have jurisdiction under 28 U.S.C. § 1292(a)(1) over appeals arising from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions." The statute has also been interpreted to cover interlocutory orders that have the "practical effect" of an injunction, meaning they are "directed to a party, enforceable by contempt, and designed to accord some or all of the relief sought by a complaint." *United States v. Samueli*, 582 F.3d 988, 993 (9th Cir. 2009). And in *United States v. Roth*, we held that a "pre-trial order restraining assets" for forfeiture under 21 U.S.C. § 853 was appealable because "such an order is a preliminary injunction for procedural purposes and therefore appealable as a preliminary injunction under [§] 1292(a)(1)." 912 F.2d 1131, 1133 (9th Cir. 1990).

The order on appeal here was issued under the authority of 21 U.S.C. § 853, the same forfeiture statute and section invoked in *Roth*. In particular, the repatriation order cites the subsection that allows the court to "enter a restraining

_____

his emergency motion for a stay pending appeal. The district court docket does not reflect that any funds have been repatriated, however.

order or injunction . . . or take any other action to preserve the availability of property" for forfeiture. *Id.* at § 853(e)(1). This record straightforwardly establishes that the repatriation order is a "pre-trial order restraining assets," appealable under § 1292(a)(1). *Roth*, 912 F.2d at 1133. And, although the repatriation order was not specifically styled as a restraining order or injunction, it clearly has that "practical effect." *See Samueli*, 582 F.3d at 993. The mandatory order is directed to Oriho, enforceable by contempt, and ensures the government's ability to reclaim unlawfully obtained funds after conviction by requiring Oriho to deposit them with the custodian designated to manage assets under forfeiture. Jurisdiction under § 1292(a)(1) is therefore proper.

B

Because we have jurisdiction we address the merits of the case: whether the repatriation order violates Oriho's Fifth Amendment privilege against self-incrimination. The Fifth Amendment states, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Oriho invokes this constitutional protection to argue that the district court wrongly concluded both that the repatriation order involves no risk of self-incrimination, and that any compelled statements are essentially a foregone conclusion that will not add anything to the government's case. Oriho contends that the order is too broad, and that the government's promise, relied upon by the court—not to use evidence of the repatriation in its case-in-chief—is not sufficient to fully protect his Fifth Amendment rights. The applicability of the self-incrimination privilege to an order for repatriation issued under the forfeiture statute is a question of first impression among the circuits.

We conclude that, as currently written, the repatriation order violates Oriho's Fifth Amendment self-incrimination privilege. The district court's application of the foregone conclusion exception was too broad, and the government's limited immunity promise is too narrow. The order cannot stand in its present form.

1

We first approach whether the self-incrimination privilege is implicated here. The Fifth Amendment privilege against self-incrimination "applies only when the accused is compelled to make a Testimonial Communication that is incriminating." *Fisher v. United States*, 425 U.S. 391, 408 (1976). But the communication need not be express or oral. "[T]he act of production itself may implicitly communicate statements of fact," because, for example, "[b]y producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." *United States v. Hubbell*, 530 U.S. 27, 36 (2000) (quotation marks omitted). And "[t]he privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). At bottom, it is the "extortion of information from the accused; the attempt to force him to disclose the contents of his own mind, that implicates the Self-Incrimination Clause." *Doe v. United States*, 487 U.S. 201, 211 (1988) (citations and internal quotation marks omitted).

The novel issue presented is whether these principles extend to protect information that might be communicated by the pre-trial transfer of funds for forfeiture. The district court's order under 21 U.S.C. § 853(e) is not part of the pre-

trial criminal discovery process,[2] but Oriho argues that repatriation of the funds in question will nonetheless reveal information that the government could use against him in this or future criminal prosecutions. Part of Oriho's concern stems from the fact that, as a pretrial detainee, he will be forced to effectuate the transfer of funds under jail surveillance. And the transfer itself may generate a paper trail of records like those often sought in discovery. *See Doe*, 487 U.S. at 203, 206–07 (analyzing self-incrimination privilege in the context of defendant's compulsion to sign a consent form for production of his bank account documents from foreign banks).

The government admits that discovery-like records "might be generated if Oriho repatriates funds from Africa." Yet it still argues that Oriho's concerns about self-incrimination are "mere speculation"—a contention supported only by citation to a case where the party asserting the privilege "flatly refused to justify his fear of criminal

---

[2] Some of the government's arguments suggest that because forfeiture is not a tool of discovery, it does not have the same Fifth Amendment implications. To the contrary, the Supreme Court and the circuit courts have broadly applied the privilege outside the formal discovery context. *See United States v. Balsys*, 524 U.S. 666, 672 (1998) (the self-incrimination privilege "can be asserted in any proceeding" (citation omitted)); *Maness v. Meyers*, 419 U.S. 449, 461 (1975) ("This Court has always broadly construed its [Fifth Amendment self-incrimination] protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action."); *cf. United States v. Antelope*, 395 F.3d 1128, 1135 (9th Cir. 2005) (holding that self-incrimination privilege was implicated by defendant's required participation in sexual abuse treatment program after conviction); *Bramble v. Richardson*, 498 F.2d 968, 973 (10th Cir. 1974) (stating that even civil forfeiture proceedings "will not be permitted to provide an avenue through which the fundamental rights of protection against . . . self-incrimination can be frustrated").

prosecution." *McCoy v. C.I.R.*, 696 F.2d 1234, 1236 (9th Cir. 1983). Oriho, in contrast, stands indicted in a major healthcare fraud case and has gone to great lengths to brief us and the district court on his specific Fifth Amendment concerns.

We are unpersuaded by the government's inapt case citations when caselaw teaches that the Fifth Amendment inquiry is unique to each situation and "often depends on the facts and circumstances of the particular case." *Doe*, 487 U.S. at 214–15. Because the facts at bar involve potential communications implicit in the act of transferring funds, the most analogous caselaw relates to information disclosed through the "act of production," as discussed in the Supreme Court's opinion in *Fisher v. United States*. *See* 425 U.S. at 409–15. The Court outlined four facets of an implicit communication that together support invocation of the self-incrimination privilege. We ask whether: (1) compulsion is involved; (2) a statement is being communicated; (3) the statement relies on the truth-telling of the defendant; and (4) the statement carries the risk of incrimination. *Id*.[3] We consider each in turn.

First, is compulsion involved? *Id*. at 409–10. The *Fisher* Court answered yes, by virtue of the defendant's receipt of a subpoena, *id.* at 410, and the same is true here. Oriho is under a compulsory court order to repatriate the funds at

---

[3] In *Antelope*, we set out only a two-part test for the self-incrimination privilege, which covered the incrimination and compulsion elements of *Fisher*. *See* 395 F.3d at 1134. But that case involved verbal statements that the government sought from the defendant, and therefore the two remaining elements of *Fisher* were inherently met. *See id.* at 1131–32; *see also id.* at 1134 (framing the self-incrimination test around "the testimony desired"). We cannot assume away those elements in the case of implicit communications.

issue and he can be held in contempt with no credit for time served against any criminal sentence he may receive following conviction on the underlying indictment if he fails to comply. *See* 21 U.S.C. § 853(e)(4)(B). The order is directed at him personally, and the repatriation would not be undertaken willingly.

Second, is a statement being communicated? *Fisher*, 425 U.S. at 410. *Fisher* again said "yes" based on the act of producing evidence in response to a subpoena, which "has communicative aspects of its own" because it may "tacitly concede[] the existence of the papers demanded and their possession or control by the [defendant]." *Id.* We agree with Oriho that the same principle applies here. The transfers named in the indictment only refer to two different banks in two African countries, yet the repatriation order demands the transfer of funds from *any* bank in *any* African country. This may provide information about other bank accounts of which the government is not yet aware, forcing Oriho to "disclose the contents of his own mind" regarding what accounts he has access to and control over in order to effectuate the transfer. *Doe*, 487 U.S. at 211 (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)).

Even solely with regard to the funds listed in the indictment under Counts 37–43, repatriation further implies Oriho's "possession or control" over allegedly unlawfully obtained money. *See Fisher*, 425 U.S. at 410. Those transfers are charged under 18 U.S.C. § 1957, which requires the government to prove Oriho had control over the funds received from the fraudulent claims and then transferred in interstate or foreign commerce to convict him. *See In re Brown*, 953 F.3d 617, 623 (9th Cir. 2020) ("Courts have held that to show that a defendant 'obtained' proceeds [of criminally derived property under § 1957], there must be a

demonstration of possession or control." (citation omitted)).
If the government is allowed to use evidence of the
repatriation transfers in court, the fact of the transfers alone
could communicate to the jury that Oriho controlled those
funds, helping to prove the government's case.

Third, *Fisher* tells us to ask whether the information
communicated somehow relies on the truth-telling of the
defendant, unlike a handwriting exemplar or blood sample.
*Id.* at 408, 410–11. To this question, the Supreme Court
answered "no," because the documents sought to be
produced belonged to and were created by the defendant's
accountant, not the defendant himself. *Id.* at 411. But here,
effectuation of the order does depend on Oriho's
truthfulness. The government and the court are relying on
Oriho to "prove the existence [and] his access to" unnamed
bank accounts and deposited funds, when he may in fact be
the only person who knows that they exist. *Id.*

Finally, and perhaps most importantly, we must ask
whether any of the implied statements poses a realistic threat
of incrimination. *Id.* at 412–13. As discussed above, the
repatriation order may force Oriho to incriminate himself by
revealing the location of bank accounts and potentially
numerous other transfers of criminally derived funds that are
presently unknown to the government. The government
could improperly use that information to support the current
charges, bring additional charges, or even to file a new
indictment against Oriho for violating other criminal
provisions of state or federal law that he might reveal in
complying with the repatriation order. *See Kastigar v.
United States*, 406 U.S. 441, 453 (1972) (self-incrimination
privilege "afford[s] protection against being forced to give
testimony leading to the infliction of penalties affixed to . . .
criminal acts" (citation and internal quotation marks

omitted)).  The possibility of incrimination by any of these routes is "realistic" and could be "substantial."  *Fisher*, 425 U.S. at 412–13.  *See also Antelope*, 395 F.3d at 1134 (self-incrimination privilege may be invoked "when the threat of future criminal prosecution is reasonably particular and apparent" and "an individual need not incriminate himself in order to invoke the privilege" (citation omitted)).

Having determined that the basic tenets of the self-incrimination privilege apply here, we conclude that the repatriation order implicates Oriho's Fifth Amendment rights.  This determination is further supported by contrasting this case with *Doe v. United States*, where the Supreme Court upheld an order compelling a criminal defendant to sign an omnibus consent directive, which allowed for production of documents from any foreign bank accounts in the defendant's name when presented by the police to a bank.  487 U.S. at 204–05, 215.  The Court determined that although the defendant's signing of the consent directive was a compelled communication, it was not testimonial because the directive was purely drafted "in the hypothetical."  *Id.* at 215.  The form did not require the defendant to identify a specific bank, "acknowledge that an account . . . is in existence or that it is controlled by [defendant]," or "indicate whether documents or any other information relating to [defendant] are present at the foreign bank."  *Id.*  Ultimately, the testimonial significance of the consent form was undermined because, "[a]lthough [such a] form allows the Government access to a potential source of evidence, the directive itself does not point the Government toward hidden accounts or otherwise provide information that will assist the prosecution in uncovering evidence.  The Government must locate that evidence 'by the independent labor of its officers.'"  *Id.* (quoting *Estelle v. Smith,* 451 U.S. 454, 462 (1981)).

None of the protections that the Court relied on in *Doe* are accounted for by the repatriation order here. If Oriho repatriates funds from as-yet-unidentified African banks, he may very well "point the Government toward hidden accounts" and allow the prosecution to sidestep its duty to independently locate evidence. *Id.* Whether directly, or by "furnish[ing] a link in the chain of evidence," *Hoffman*, 341 U.S. at 486, Oriho could incriminate himself through the testimonial statements compelled by the order. The district court was wrong to conclude otherwise.

2

The district court also relied on the foregone conclusion exception, which allows for circumvention of the self-incrimination privilege if the government already has the information it is seeking to compel. *See Fisher*, 425 U.S. at 411 (characterizing a foregone conclusion as one where the evidence "adds little or nothing to the sum total of the Government's information"). For this "exception to apply, the government must establish its independent knowledge of three elements: the documents' existence, the documents' authenticity and [the defendant's] possession or control of the documents." *United States v. Sideman & Bancroft, LLP*, 704 F.3d 1197, 1202 (9th Cir. 2013) (citation omitted). Oriho contends that the district court clearly erred in its broad application of the exception, and we agree.

The district court's foregone conclusion analysis rested on two pieces of information: the indictment's approximate total of $7,287,000 in fraudulent payments made to Oriho, and the government's bald assertion in a motion that it "already knows that the Defendant transferred approximately $2,400,000 to African countries since January 1, 2016." The government provided no support for its statement about Oriho's alleged transfer of $2,400,000,

and there is no reference to this figure in the indictment. We reject the government's argument that Oriho "did not challenge" the legitimacy of this figure and it should therefore be accepted. Oriho has doggedly opposed the entire basis of the government's repatriation motion, requested and was denied an evidentiary hearing to put the government to its proof, and has brought an interlocutory appeal of the district court's subsequent order. Even if we were to take the government's word, neither of the multi-million dollar figures relied on by the district court show that the government is aware of all the information that could be implicitly communicated by the repatriation; namely, the existence and location of specific bank accounts holding additional funds and whether Oriho has control over them. We conclude that the government cannot satisfy the first or third elements of the foregone conclusion test. *See id.*

The government also has not proven that it can independently verify the authenticity of information gathered through the repatriation because that element of the test "inquires into whether the government is compelling the witness to use his discretion in selecting and assembling the responsive documents." *In re Grand Jury Subpoena Dated April 18, 2003*, 383 F.3d 905, 912 (9th Cir. 2004) (holding that application of foregone conclusion exception was clear error). By identifying and repatriating all of the funds he has transferred to any bank in Africa during a three-year time period, Oriho is being tasked with "tacitly providing identifying information that is necessary to the government's authentication of the [compelled material]." *Id.* The government needs to show that it can authenticate the evidence without Oriho's assistance, *Bright*, 596 F.3d at 693, but conceded at oral argument that it cannot currently provide evidentiary support for the full sum authorized by

the repatriation order.[4]  Thus, the district court's application of the foregone conclusion exception to all $7,287,000 was clear error.

We found clear error in a similar situation where "the government made no showing that it knew [defendants] maintained possession or control of [two bank] accounts and thus of the account documents" sought by a summons.  *Id.* at 694.  That opinion contrasted those two accounts with two others specifically named in the summons, the existence of which *was* a foregone conclusion because the government independently knew about, had account numbers for, and could show that the defendants had access to them.  *Id.* at 693–94.  In the present case, though the transfers to accounts specifically named in the indictment are already known to the government based on the Grand Jury's determination of probable cause, the unnamed array of African accounts reachable under the order (including any that might house the $2,400,000 the government says it "already knows" about) resemble those that failed to meet the foregone conclusion requirements in *Bright.*

---

[4] For purposes of the foregone conclusion test, the government only needs to prove that it is possible that "the records could be independently authenticated by banking officials."  *Bright*, 596 F.3d at 693 ("[n]or did the government need to prove that it had previously authenticated the same documents or that it had used these same bank officials in the past").  *See also id.* at 693 n.4 (even where there are no treaties between the United States and the foreign government where the bank accounts are located, the documents could be authenticated through American card servicing company).  Even if this prong of the test can be satisfied, the district court will likewise need to be vigilant that the government does not rely on any privileged information gained through repatriation to *actually* authenticate documents introduced at trial.  Fed. R. Evid. 402 (evidence is inadmissible if it violates the United States Constitution).

On the evidence before us, the only potentially correct application of the foregone conclusion exception was to the $760,000 in transfers named in Counts 37–43. The district court could properly rely on the Grand Jury's probable cause determination regarding Oriho's transfer to the receiving accounts in Kenya and Uganda on the dates and in the amounts alleged to support a repatriation order. It would not be illogical to conclude that Oriho owned or controlled the accounts at the Kenyan and Ugandan banks identified in the indictment. If all that is true, the district court could properly surmise that the government will not learn anything new about the existence, authenticity, or Oriho's control over the funds named in the indictment to justify repatriation. Though the indictment does not provide account numbers for the Kenyan and Ugandan bank accounts, the specific dates, bank names, and dollar amounts create a fairly high degree of certainty about the government's current independent knowledge.

Therefore, on the record as presented to us, $760,000 is the only supportable monetary cap for the order because any other compelled repatriation would violate Oriho's self-incrimination privilege. But given that the record evidence on this point is scarce, we instruct the district court on remand to hold an evidentiary hearing to determine the correct monetary cap. To do so, the court must determine whether the government can prove the elements of the three-pronged foregone conclusion test outlined above, and to which funds it applies.

3

The district court's final effort to assuage the Fifth Amendment concerns Oriho presented in opposition to the repatriation order was to confirm the enforceability of the government's promise that it "will not introduce evidence

that [Oriho] repatriated funds from Africa in its case-in-chief."**5**  Oriho argues that even with this promise in place, the government will still be able to use information gained from repatriation in rebuttal, on cross-examination, or to bring new charges against him.  He is correct.

Though "the government has an option to exchange the [self-incrimination] privilege for an immunity to prosecutorial use of any compelled inculpatory testimony," it *must* "provide an immunity as broad as the privilege itself."  *Balsys*, 524 U.S. at 682.  As Oriho points out, the self-incrimination privilege extends, not just to evidence that might be used in the government's case-in-chief, but to all evidence that might provide a "link in the chain of evidence" in any future criminal proceeding against him.  *Maness*, 419 U.S. at 461.  The language of the government's promise does not fully "negate[] the possibility of a Fifth Amendment violation," as the district court concluded and as required by law.  *See Balsys*, 524 U.S. at 682.  And for the same reasons, "pocket immunity"—an informal promise of immunity from the prosecutor in this case that provides protection in only one jurisdiction—also does not suffice.  *See id.* (it is "intolerable to allow a prosecutor in one or the other jurisdiction to eliminate the privilege by offering immunity less complete than the privilege's dual jurisdictional reach"); *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 78 (1964) (privilege against self-incrimination protects "a federal witness against incrimination under state as well as federal

---

**5** The language of this promise was essentially plucked from two out-of-Circuit district court cases, neither of which provides support for the use of such limited protection here. *See United States v. Morrison*, No. 04-699, 2006 WL 2990481 (E.D.N.Y. Oct. 19, 2006) (inapposite facts because defendant previously disclosed information sought); *United States v. Sellers*, 848 F. Supp. 73, 77 (E.D. La. 1994) (opinion includes almost no self-incrimination analysis).

law"). Only full use immunity would override any compelled violation of the self-incrimination privilege. *See Kastigar*, 406 U.S. at 453 (noting that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination").

We direct the district court to revise the repatriation order on a more complete evidentiary record to avoid any infringement of Oriho's Fifth Amendment rights. If the court foresees any further self-incrimination that might occur as a result of this order, it is free to limit the introduction of compelled evidence at trial or enforce the requirements of 18 U.S.C. §§ 6001–03, if the government chooses to offer statutory immunity. We leave to the district court on remand whether a formal use immunity order authorized by the Justice Department may be required if Oriho does not comply with the revised repatriation order and "the testimony or other information from [Oriho] may be necessary to the public interest." *Id.* at § 6003(b).

\*\*\*

As currently framed, the pre-trial repatriation order violates Oriho's self-incrimination privilege under the Fifth Amendment. The foregone conclusion exception was improperly applied, and the government's limited use immunity promise is insufficient to alleviate the order's harms to Oriho's constitutional rights. We must therefore vacate the district court's order. But because the district court did not previously hold a hearing on this issue, we remand for an evidentiary hearing to consider what factual information may support application of the foregone conclusion exception under the proper test, and to what amount of the alleged fraudulent proceeds the exception applies.

**VACATED and REMANDED with instructions.**